[Nos. 57997-5-I; 58053-1-I;    Division One.    February 25, 2008.]
58918-1-I.

MAHMOUD SOURAKLI, *Respondent*, v. KYRIAKOS, INC., ET AL., *Defendants*, DIAMOND PARKING, INC., ET AL., *Respondents*, NIKO L. JONES, *Petitioner.*

502

*Frank J. Steinmark* and *Kathryn A. Keaton* (of *Chism Thiel McCafferty Campbell & Steinmark, PLLC*), for petitioner.

*Laurie M. Thornton* (of *Corr Cronin Michelson Baumgardner & Preece, LLP*), for respondent Aaron Byers.

*Gary A. Trabolsi* and *Raymond V. Bottomly* (of *Gardner Bond Trabolsi, PLLC*), for respondent Diamond Parking, Inc.

*Rebecca J. Roe*, *William J. Rutzick*, and *Janet L. Rice* (of *Schroeter Goldmark & Bender, PS*), for respondent Mahmoud Sourakli.

¶1 BECKER, J. — Mahmoud Sourakli, an innocent passerby, was shot and gravely injured when a bullet hit him in

the back as he was walking late at night near a popular Seattle nightclub where gang members had gathered. Sourakli seeks to impose liability for his injury upon the businesses that induced the gangs to congregate near the nightclub without providing adequate security services to prevent violence. Ordinarily, third parties do not have tort liability for the criminal acts of others. The conduct of the business defendants who remain in this case does not bring them within the exceptions to the general rule.

¶2 At the center of this dispute is Mr. Lucky, a nightclub located directly across the street from Key Arena in Seattle. Because the club draws a rough crowd, including gang members, Mr. Lucky hired Titan Security in the fall of 2003.

¶3 On the night of Friday, December 12th, 2003, Mr. Lucky was hosting a special event. Mr. Lucky had hired Prolific Records to promote the event and fill the club with patrons. As part of the promotion, the radio station KUBE 93 FM was broadcasting live from the club into the early morning hours, extending a general invitation to come to the club. Approximately seven Titan security guards were present. The unarmed security team was in charge of patting down people entering the club for weapons, enforcing the club's dress code, and preventing or breaking up disturbances within the club.

¶4 The guards were turning away would-be patrons in part because Mr. Lucky had reached capacity and also because Prolific Records had instructed them to turn away gang members known to have been involved in recent assaults at other bars. As a result, people were lining up along the sidewalk and congregating in a Diamond Parking lot adjacent to the club to the north. The parking lot was self-service; there was no attendant on duty. On the southwest corner of the lot, right next to Mr. Lucky, a hot dog stand was operating under a lease from Diamond. The hot dog stand stayed open on weekend nights after Mr. Lucky closed, sometimes as late as 2:45 a.m., with people loitering about.

¶5 Mahmoud Sourakli and a group of friends were walking south toward the club down First Avenue North when shooting started shortly after 2 a.m. Sourakli had not been a patron of Mr. Lucky that evening. Sourakli saw a large group of people congregated in the Diamond parking lot. He heard "loud, multiple rapid shots."[1] A bullet hit Sourakli in the back of the neck, and he fell to the ground.

¶6 Sourakli's girl friend immediately called 911 for help. A woman living in the neighborhood also called 911 to report that she heard approximately 15 shots fired "from the area of the Diamond lot."[2]

¶7 Police arrived on the scene at 2:16 a.m. The crowd in the parking lot had scattered by the time the police arrived. Two hot dog vendors who were present said they dove behind their carts and did not see who was shooting.

¶8 Detective Greg Tomlinson responded to the scene at 2:20 a.m. and began an investigation. He identified several gang members who had knowledge about the shooting. One man admitted to being in one of the cars from which shots were fired. He said that two rival gangs had been arguing over drug-dealing turf and that this had erupted into a gunfight as the gangs left in their cars. Based on his investigation, Detective Tomlinson concluded that "several shots had been fired from at least two vehicles as they left the Diamond parking lot on the north side of Mr. Lucky's."[3] There were no shots reported as being fired in any other area at that time. From this evidence and the location of shell casings, Detective Tomlinson inferred that the bullet removed from Sourakli's back had been fired by someone in one of the vehicles leaving the Diamond parking lot. He concluded that a bullet fired from this particular type of gun could easily travel the distance to where Sourakli was walking along First Avenue North.

---

[1] Clerk's Papers at 213.

[2] Clerk's Papers at 138.

[3] Clerk's Papers at 160.

¶9 Police were not able to identify the person who fired the shot, and they did not find the gun. Due to insufficiency of the evidence to prove a charge against a particular defendant, the criminal case is currently inactive.

¶10 Detective Tomlinson stated in his declaration that he had previously responded to complaints of trouble at Mr. Lucky and was aware of large groups of people loitering in the Diamond parking lot. Police would walk through the lots to break up fights. They were particularly concerned about the safety of the parking lots because in view of the pat-down policy at Mr. Lucky, people would leave guns in their cars.

¶11 Sourakli is a quadriplegic as a result of the injuries caused by the shooting. He filed this lawsuit on February 3, 2006. The defendants named in Sourakli's civil complaint included Mr. Lucky, Diamond Parking, Titan Security, Clear Channel Broadcasting (KUBE 93 FM), and Prolific Records. The complaint alleged that the defendants created a dangerous situation by attracting armed gangs without providing sufficient security services.

¶12 All five defendants moved for summary judgment on the grounds that they did not have a duty to protect Sourakli from the criminal acts of a third party and that proximate cause was lacking. Sourakli responded that the businesses should bear the responsibility for the absence of adequate security because they created and profited from the activities at Mr. Lucky. Sourakli showed that the club had a history of violence and had refused to "beef up" security despite having notice that dangerous crowds were attracted by promotional events.

¶13 The court granted motions to dismiss made by Clear Channel, Prolific Records, and Diamond Parking. The court denied motions for summary judgment made by Titan Security and Mr. Lucky. The court reasoned that Mr. Lucky, the possessor of land, had a duty based on the club creating a special temptation or opportunity for crime, and "under the limited and specific circumstances of this case" the

criminal activity was reasonably foreseeable.[4] The court found that the same premises liability extended to Titan Security for acting on behalf of Mr. Lucky.

¶14 Sourakli settled with Mr. Lucky, leaving Titan Security as the only remaining defendant. Titan successfully petitioned this court for discretionary review of the order denying its motion for summary judgment. This court then agreed to treat as final the dismissal orders granted to Diamond Parking and Prolific Records. Sourakli has appealed from the orders dismissing these two defendants, and his appeal has been consolidated with our discretionary review of the order denying summary judgment to Titan.

¶15 "The standard of review of an order of summary judgment is de novo, and the appellate court performs the same inquiry as the trial court." *Jones v. Allstate Ins. Co.*, 146 Wn.2d 291, 300, 45 P.3d 1068 (2002). "Summary judgment is appropriate only if the pleadings, affidavits, depositions, and admissions on file demonstrate the absence of any genuine issues of material fact and that the moving party is entitled to judgment as a matter of law." *Sheehan v. Cent. Puget Sound Reg'l Transit Auth.*, 155 Wn.2d 790, 797, 123 P.3d 88 (2005). "The nonmoving party may not rely on speculation or argumentative assertions." *Craig v. Wash. Trust Bank*, 94 Wn. App. 820, 824, 976 P.2d 126 (1999). Questions of law are reviewed de novo. *Barr v. Day*, 124 Wn.2d 318, 324, 879 P.2d 912 (1994). The existence of a duty is a question of law. *Minahan v. W. Wash. Fair Ass'n*, 117 Wn. App. 881, 890, 73 P.3d 1019 (2003).

## TITAN SECURITY

¶16 Titan claims the trial court erred in denying its motion for summary judgment because Titan did not owe a duty to Sourakli. Sourakli responds Titan had a duty to plaintiff under either the rescue doctrine or its contract with Mr. Lucky. Sourakli's argument on appeal is not the

---

[4] Report of Proceedings (Mar. 3, 2006) at 105.

argument he made in the trial court, and it is not the argument he advanced in responding to Titan's motion for discretionary review.

¶17 At summary judgment, Sourakli claimed that all defendants were negligent based on the theory that possessors of land are liable for the foreseeable consequences of their activities on their premises which injure persons off the premises. He argued that the defendants owed a duty to passersby based on *Restatement (Second) of Torts* §§ 368 and 371 (1965) as well as *Hutchins v. 1001 Fourth Avenue Associates*, 116 Wn.2d 217, 802 P.2d 1360 (1991). Sourakli alleged that even the defendants who were not possessors of land (Titan, Prolific Records, and Clear Channel) were liable to the same extent as Mr. Lucky on a premises liability theory because "they carried on an activity upon the land" on behalf of Mr. Lucky.[5]

¶18 In response to Titan's motion for discretionary review in this court, Sourakli continued to rely on premises liability as a basis for finding Titan negligent. Sourakli argued that Titan Security, as agent for Mr. Lucky, had a duty to provide security services based upon the level of its expertise without regard to the contractual limits on the scope of its duty. Our commissioner characterized Sourakli's tort theory against Titan as "a dramatic expansion of existing negligence standards."[6]

¶19 From the briefs Sourakli submitted after discretionary review was granted, we conclude that Sourakli has abandoned his premises liability theory against Titan. Instead of responding to our commissioner's critique, Sourakli now contends that Titan had a duty based on the rescue doctrine or arising from its contractual obligations to Mr. Lucky. He points to evidence that approximately 15 minutes before the shooting, Aaron Byers of Prolific Records heard about guns being displayed in the parking lot and told one of Titan's people inside the club to call 911.

---

[5] Clerk's Papers at 794.

[6] Commissioner's Ruling at 2.

Titan did not call. Sourakli contends that if Titan had called 911 with this information, police would have arrived soon enough to break up the crowd and prevent the gunfight.

¶20 "On review of an order granting or denying a motion for summary judgment the appellate court will consider only evidence and issues called to the attention of the trial court." RAP 9.12. An argument neither pleaded nor argued to the trial court cannot be raised for the first time on appeal. *Sneed v. Barna*, 80 Wn. App. 843, 847, 912 P.2d 1035 (1996). Sourakli's case against Titan on appeal depends entirely on arguments not raised below. He has not attempted to rebut the conclusions reached by our commissioner in the order granting discretionary review. We adopt our commissioner's reasoning and conclude Titan did not owe a duty to Sourakli as an agent for Mr. Lucky. We decline to consider whether Titan had a duty under the rescue doctrine or arising from its contract.

¶21 The trial court order denying summary judgment to Titan is reversed.

## PROLIFIC RECORDS

¶22 Sourakli appeals the order granting summary judgment dismissal to Prolific Records. In this court, Sourakli contends that Aaron Byers, acting on behalf of Prolific, had a duty based on the rescue doctrine. To demonstrate that he preserved this issue by raising it below, Sourakli cites a few sentences from his response to the motion for summary judgment:

> Some girls came up and told [Byers] to call 9-1-1 because some guys in the parking lot had guns. He did not. He claims to have told security to call 9-1-1. He had his cell phone. He went back in the club, and about 10-15 minutes later, heard gunfire.
>
> . . . .

> If Mr. Byers himself had called that night, it is probable that the dispute that resulted in the accidental shooting of Mr. Sourakli would have been stopped.[7]

¶23 Sourakli did not present the rescue doctrine to the trial court as a separate basis for defeating the motion for summary judgment. We have reviewed Sourakli's complaint, his response to the defendants' motions for summary judgment, and his answer to Titan's motion for discretionary review. In these documents, Sourakli did not mention the rescue doctrine or cite any of the cases involving the rescue doctrine that he now relies on. The passages that Sourakli cites to demonstrate that he preserved the issue are embedded in a different context. Neither the table of contents nor the headings within the motion identify the rescue doctrine as a separate theory. Upon reading the motion, neither the trial court nor the defendants could reasonably be expected to perceive that Sourakli intended to pursue the rescue doctrine as a separate theory of liability. Because Sourakli did not preserve this issue, we decline to consider the argument on appeal. The order granting Prolific Records motion for summary judgment is affirmed.

## DIAMOND PARKING

¶24 Sourakli also appeals the dismissal of his claim against Diamond Parking. As to Diamond, he maintains the same theory on appeal that was presented below: that a jury could find Diamond was charged with a duty as a result of its having created a special or peculiar temptation for criminal activity on its parking lot, and that Diamond breached its duty by failing to provide adequate security.[8]

> Although Diamond is aware of criminal activity in its lots adjacent to bars, it has refused to post an attendant on such lots, install video cameras, pay for security personnel, or close

---

[7] Clerk's Papers at 764 (citations omitted), 803.

[8] Resp't's/Cross-Appellant's Br. at 33.

the lots at dangerous times. Diamond has made sure that its box where customers pay their money is well-lit, but has not provided adequate lighting to deter crime.[9]

¶25 The leading case in Washington involving a landowner's duty to protect a passerby from the risk of assault on the premises is *Hutchins*, 116 Wn.2d 217. In *Hutchins*, the plaintiff was making his way back to his hotel in downtown Seattle after dinner. A stranger approached the plaintiff, engaged him in conversation, and then pushed him into an unlit armored car bay, where the plaintiff was assaulted and robbed. The plaintiff sued the occupiers of the land, claiming that they breached the duty of a person who owns or controls buildings adjacent to a public way to maintain the buildings free of any conditions posing unreasonable dangers to passersby. *Hutchins*, 116 Wn.2d at 220. The plaintiff claimed the defendants should have known that it was a high crime area and that the car bay provided a prime place for criminal activity to take place out of the public view.

¶26 The Supreme Court affirmed the trial court's decision to dismiss on the basis that the defendants owed no duty under the circumstances. There is generally no duty to prevent a third party from physically harming another unless a special relationship exists between the defendant and either the third party or the foreseeable victim. *Hutchins*, 116 Wn.2d at 227. However, in some exceptional circumstances a defendant may be liable for harm caused by a third party even where there is no special relationship. Such circumstances exist "where defendant affirmatively brings about 'an especial temptation and opportunity for criminal misconduct' which will give rise to a duty on defendant's part to take precautions against it." *Hutchins*, 116 Wn.2d at 230 (quoting W. Page Keeton, Dan B. Dobbs, Robert E. Keeton & David G. Owen, Prosser and Keeton on the Law of Torts § 33, at 201 (5th ed. 1984)). "By definition,

---

[9] Clerk's Papers at 798.

whatever there is about defendant's property which will require the defendant to anticipate and guard against the intentional criminal misconduct of another, the defendant must have affirmatively created or exposed plaintiff to 'a recognizable high degree of risk of harm . . . '." *Hutchins*, 116 Wn.2d at 232 (alteration in original) (quoting RESTATE-MENT (SECOND) OF TORTS § 302B cmt. e (1965)). In *Hutchins*, merely maintaining a shadowy area in a building bordering a downtown sidewalk was not enough to incur liability even though the shadows can provide cover for a criminal assault.

¶27 The trial court analyzed Sourakli's claim against Diamond under *Hutchins* and dismissed the claim after concluding there was "no evidence that Diamond Parking acted unlawfully in how it operated its parking lot, or that Diamond was on notice of the alleged activities that plaintiff contends took place on their premises."[10]

> The plaintiff advances no case on point supporting extending the duty of landowners to the circumstances now before this Court relating to Diamond Parking's alleged activities.
>
> Lucky's patrons may have used Diamond's parking lot and increased loitering and loud music on the premises. That conduct as a matter of law does not serve as notice to a possessor of land that intentional criminal assault of a passerby off premises, one and a half blocks away [might occur, and it does not] create a duty of increased security or cameras.
>
> Moreover, there is no evidence before this Court . . . that Diamond affirmatively created or exposed plaintiff to a recognizable high degree of risk of harm.
>
> The Court undoubtedly agrees that the injuries to the plaintiff are horrific. The unfortunate reality of our society is that a criminal component of our society engages in deplorable conduct.
>
> As the Court stated in *Hutchins*, however, to extend a duty to Diamond as requested by plaintiff would make urban land

---

[10] Report of Proceedings (Mar. 3, 2006) at 97-98.

possessors the insurers of all those passing on public sidewalks and streets.[11]

¶28 *Hutchins* lists examples of situations in which a duty might arise based on creating a special temptation for criminal activity: leaving an open box of dynamite caps near a playground where small children play, leaving chemicals in an unsecured place on school property where they are accessible to children, and building scaffolding in a manner that makes the terrace to an adjacent apartment building accessible to robbers. *Hutchins*, 116 Wn.2d at 230-32.

¶29 Sourakli contends that Diamond, as a landowner, created a situation sufficiently special and out of the ordinary to qualify as a special temptation to criminal activity. Sourakli cites *Prince v. Chehalis Savings & Loan Ass'n*, 186 Wash. 372, 58 P.2d 290 (1936). In *Prince*, the Supreme Court affirmed the judgment for the plaintiff when a fire that started on the defendant's property spread to the adjacent property and burned his neighbor's house down. The defendant had allowed his property "to get into such a state of disrepair that it created a fire hazard, and . . . the condition of the building was such that, if a fire did occur in it, it was reasonably probable that it would spread to the adjacent property." *Prince*, 186 Wash. at 373. The building at issue was a garage that had previously been "a place for wrecking used automobiles." *Prince*, 186 Wash. at 373. There was a lot of grease and oil on the floor, there was an accumulation of combustible material, the doors at either end were open, and the windows were broken out. Children played in the garage and homeless people slept there. Cigarette stubs littered the floor. The court imposed liability because the defendant knew of the hazardous condition on his property and allowed such a condition to exist even though the danger and fire hazard could have been removed with the exercise of ordinary and reasonable care. *Prince*, 186 Wash. at 374-75.

---

[11] Report of Proceedings (Mar. 3, 2006) at 96-97.

¶30 The examples in *Hutchins* and *Prince* of affirmative activity by a landowner that creates a special temptation for criminal activity are materially different from what is known about Diamond's conduct. It is true that Diamond allowed the hot dog stand to keep operating and attracting crowds of people late at night when the club emptied out. But crowds loitering around a hot dog stand are not inherently dangerous in the same way as dynamite caps, poisonous chemicals, or an abandoned and grease-soaked garage.

¶31 Sourakli claims that the criminal activity was "open, obvious and chronic" and was either ignored by Diamond employees or should have been discovered.[12] The police recognized that Diamond was a dangerous place on weekend nights because of the unruly loiterers and gang members, and the guns kept in the cars. A declaration from one neighbor states that he contacted the police on approximately six occasions to report fights in the area surrounding Mr. Lucky and spilling into the Diamond lot. Another neighbor declared that she had heard gunfire in the area of the fights on two previous occasions and believed the shots came from the Diamond lot. Several people declared there was routinely a lot of trash in the parking lot. An expert hired by Sourakli asserts that Diamond chose to have employees check the lots periodically rather than set up a staffed pay station because Diamond knew the lot was dangerous.

¶32 But such evidence of criminal activity by others, even if Diamond was or should have been aware of it, does not establish affirmative activity by Diamond creating an especial temptation for the criminal activity to occur. As Diamond points out, unless there is a special relationship giving rise to duty, actual or constructive notice of danger does not by itself create the duty.

¶33 Sourakli also argues that Diamond created a temptation for criminal activity by failing to keep the parking lot

---

[12] Resp't's/Cross-Appellant's Br. at 36.

well lit or covered by surveillance cameras. But the same could be said of the landowner in *Hutchins*. Lights and cameras are preventive measures against crime; the failure to provide them is not in and of itself a special temptation to crime. Any obligation to take such precautionary measures against crime arises only when the especial temptation has been created.

¶34 We conclude Diamond did not affirmatively create any condition at its parking lot that served as a special temptation to criminal conduct, exposing passersby such as Sourakli to a recognizably high degree of risk of harm from criminal activity. The trial court properly dismissed the claim against Diamond for lack of duty.

¶35 Because Sourakli's nuisance theory against Titan and Diamond rests on the same facts as his negligence theory against those defendants, it does not provide an alternative basis to proceed against them in a suit for damages. *Hostetler v. Ward*, 41 Wn. App. 343, 360, 704 P.2d 1193 (1985).

¶36 The decision to dismiss Prolific Records and Diamond Parking is affirmed. The decision to deny Titan's motion for summary judgment is reversed.

GROSSE and BAKER, JJ., concur.

Review denied at 165 Wn.2d 1017 (2009).