[No. 66190-6-I. Division One. October 31, 2011.]

SILVERHAWK, LLC, *Appellant*, v. KEYBANK NATIONAL ASSOCIATION, *Respondent*.

*Maygan Holly Hurst* and *Michael D. Bohannon*, for appellant.

*Shannon Lavell McDougald* (of *McDougald & Cohen PS*), for respondent.

¶1 BECKER, J. — Where a swap agreement provides for payments over a fixed period of years and does not provide for early termination, a party who obtains release from the agreement by payment of an early termination fee has made an accord and satisfaction. Here, appellant claims the swap agreement did provide for early termination by setting forth a specific method for calculating an early termination fee, but appellant failed to raise a genuine issue of material fact with respect to this claim when confronted with a motion for summary judgment. Accordingly, we affirm the order dismissing appellant's action for breach of contract.

¶2 Appellant Silverhawk LLC was formed as a limited liability company more than 14 years ago. The members included Victoria Bowman, Carl Jacobsen, Lisbet Jacobsen, and managing member Stephen C. Bowman. Maygan Hurst, formerly Maygan Bowman, was Silverhawk's in-house counsel.

¶3 On November 5, 1998, Silverhawk made two agreements with KeyBank. One of the agreements was an International Swap Dealers Association Inc. (ISDA) Master Agreement. The parties declared in the "master agreement" that they intended to enter transactions with each other called "schedules" and "confirmations," to be governed by the master agreement. Section 6 of the master agreement contained certain provisions for terminating a swap agreement and determining what payments would be due in the event of an "early termination date." Under certain circumstances, KeyBank would be required to obtain "market quotations" from other lending institutions in order to calculate the early termination fee. The second agreement was a schedule, specifying that if an early termination date occurred, the bank would obtain market quotations to calculate the settlement amount due.

¶4 In July 2001, Silverhawk obtained a 10-year variable rate loan from KeyBank, with the bank taking a security interest in Silverhawk's real property located in Auburn, Washington. On the same day, Silverhawk and KeyBank signed a confirmation of a separate swap agreement.[1] The Auburn property served as collateral for the swap as well as for the loan. The confirmation was to be effective from August 1, 2001, to August 1, 2011. We will refer to the three agreements—the master agreement, the schedule, and the confirmation—as "the swap."

¶5 In 2008, Silverhawk contracted to sell the Auburn property to another party. Silverhawk notified KeyBank of the sale. It was understood that to obtain release of the collateral, Silverhawk would have to pay off the loan, terminate the swap, and pay some amount of money to KeyBank for terminating the swap early.

¶6 An e-mail from a KeyBank representative to Silverhawk on December 5, 2008, stated that the estimate for the

---

[1] A general description of a swap agreement is found in *Thrifty Oil Co. v. Bank of America National Trust & Savings Ass'n*, 322 F.3d 1039, 1042-43 (9th Cir. 2003).

cost of terminating the swap was $106,283, an estimate that would have to be updated on the date of the loan payoff:

> Maygan,
>
> Please note the loan payoff is separate from the swap termination.
>
> The loan payoff is projected to 12/15 $992,809.01
>
> The swap termination was quoted on 12/2, but will need to be updated on the payoff date.
>
> $106,283
>
> **The total would be $1,099,092.01**
>
> Thank you,
>
> Kevin Brown[2]

¶7 The sale of the Auburn property was scheduled to close on December 30, 2008. On December 30, Silverhawk representatives Maygan Hurst, Stephen Bowman, and Victoria Bowman called KeyBank and were given an updated quote of $123,167 for the swap termination. They agreed to the amount, the escrow agent transferred payment to KeyBank by wire, and the real estate transaction closed at 2:24 p.m.

¶8 Over the next couple of weeks, Silverhawk became concerned that KeyBank had not calculated the termination fee for the swap in accordance with the swap agreement. On January 14, 2008, Silverhawk asked KeyBank for the market quotations the bank had used in making the calculations. KeyBank replied that it had not obtained market quotations because that method of calculating the termination fee did not apply where Silverhawk and KeyBank had mutually agreed to terminate the swap:

> Maygan,
>
> Because the swap was mutually terminated, the Second Method/Market Quotation provision does not apply. It only

---

[2] Clerk's Papers at 98 (e-mail).

applies to an early termination event (e.g., payment default by either Key and/or Silverhawk). Also, that provision is typically enforced at time of execution (or a practical time thereafter) and not retroactively.

Unless explicitly dictated at time of execution (usually by bankruptcy court or another enforcement authority), Key does not go to 4 other institutions for their replacement rates (imagine if every bank did this for every termination, the market would be flooded with these requests). You are more than welcome to reach out to our peer banks (e.g., Bank of America, Wells Fargo, or US Bank) for unbiased reassurance on how the termination process works and how the value is calculated. I'd be very surprised if our process/cost did not fall into a reasonable variance with other banks.[3]

¶9 On July 7, 2010, Silverhawk filed the present lawsuit against KeyBank, alleging that it was a breach of contract for the bank to collect a termination fee that had not been calculated using market quotations. Silverhawk estimated its damages as more than $20,000.

¶10 On October 8, 2010, KeyBank moved to dismiss under CR 12(b)(6). The bank put the swap documents before the court and summarized its position as follows:

The termination was made solely as a result of the oral and written agreement between Key and Plaintiff requiring payment of $123,167.00 to Key from Plaintiff to terminate the otherwise valid Swap. Rao Decl. at ¶24. Neither party had provided or received notice of an Early Termination Date under the ISDA Master Agreement that would trigger a default calculation of any amount due under the Swap. Id.[4]

¶11 A review of the swap documents shows that notice of an early termination date is discussed in section 6 of the master agreement. That section allowed KeyBank to designate and give notice of an early termination date if an additional termination event occurred:

---

[3] Clerk's Papers at 110 (e-mail).

[4] Clerk's Papers at 7-8 (motion).

(iii) ***Right to Terminate.*** If:-

. . . .

(2) An . . . Additional Termination Event occurs,

. . . the party which is not the Affected Party [KeyBank] in the case of . . . an Additional Termination Event if there is only one Affected Party <u>may</u>, by not more than 20 days notice to the other party and provided that the relevant Termination Event is then continuing, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all Affected Transactions.[5]

The market quotation method would be in effect only if an early termination date was designated.[6]

¶12 KeyBank argued Silverhawk's action for breach of contract was unfounded because the market quotation method was not applicable. According to the bank, when the parties agreed that the swap would be terminated by Silverhawk's payment of $123,167, this constituted an accord and satisfaction concerning an issue not provided for by contract.

¶13 Responding, Silverhawk acknowledged that an early termination penalty was due if the swap terminated before its maturity but asserted that under the parties' agreements, such penalty was to be determined by market quotations. Silverhawk did not point out to the trial court any specific section or term of the swap agreement supporting this conclusion. Silverhawk did not present evidence or argue that either party had given notice of an early termination date. Silverhawk provided only two conclusory paragraphs of analysis aimed at rebutting the bank's claim that the parties had reached an accord and satisfaction. The two paragraphs read as follows:

Accord and satisfaction requires that the parties have: (1) a bona fide dispute; (2) an agreement to settle that dispute; and

---

[5] Clerk's Papers at 58-59 (Master Agreement § 6(b)(iii)) (emphasis added).

[6] *See* Clerk's Papers at 59 (Master Agreement § 6(c)(ii)), 60 (Master Agreement § 6(e)(i)(3)).

(3) performance of that agreement. Paopao v. State, Dept. of Social and Health Services, 145 Wn. App. 40, 46, 185 P.3d 640 (2008). In order to establish this defense, the proponent must show that a bona fide dispute existed at the time payment was made. Housing Authority of County of King v. Northeast Lake Washington Sewer and Water Dist., 56 Wn. App. 589, 596, 784 P.2d 1284[, 789 P.2d 103, *review denied*, 115 Wn.2d 1004] (1990).

Here, the record contains no evidence of an agreement between KeyBank and Silverhawk to settle a dispute. Indeed, at the time of payment, Silverhawk understood the amount to be the correct Settlement Amount calculated pursuant to the Swap Agreement. V. Bowman Decl. ¶2, S. Bowman Decl. ¶2 and Hurst Decl. ¶7. Contrary to KeyBank's claims, the dispute did not arise until after payment was wire transferred to KeyBank. Hurst Decl. ¶8 and 11. Genuine issues of fact exist as to the time, nature and scope of the parties' dispute and whether an agreement to resolve that dispute was entered *into*. Those factual issues preclude summary judgment and dismissal of the case.[7]

Declarations by Silverhawk members stated that they did not negotiate the termination fee with KeyBank and at the time of execution believed that the bank had calculated the termination amount using the master agreement market quotation method.

¶14 The trial court treated the motion as a motion for summary judgment because it was accompanied by declarations and documents. The court granted KeyBank's motion to dismiss, concluding that Silverhawk's voluntary payment of $123,167 in exchange for release of its obligations under the swap was sufficient for an accord and satisfaction.

¶15 On appeal of summary judgment, the standard of review is de novo, and the appellate court performs the same inquiry as the trial court. A court may grant summary judgment if the pleadings, affidavits, and depositions estab-

---

[7] Clerk's Papers at 85 (response) (footnote omitted).

lish that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Lybbert v. Grant County*, 141 Wn.2d 29, 34, 1 P.3d 1124 (2000).

¶16 Below, the bank asserted that there had been no notice given of what the agreement refers to as an early termination date, and consequently, the swap agreement did not call for the use of market quotations to determine the early termination fee. Silverhawk did not dispute the bank's assertion that no notice had been given of an early termination date. And Silverhawk did not explain how the contract could be interpreted as requiring the use of market quotations absent notice of an early termination date.

¶17 On appeal, Silverhawk goes into the terms of the swap agreement in some detail and argues that under schedule section 1(i), the repayment of the loan was an "additional termination event" that automatically generated an early termination date under section 6 of the master agreement, thereby triggering the requirement to use market quotations in calculating a fee for early termination of the swap. This analysis is unpersuasive,[8] but more significantly, it is untimely.

¶18 "On review of an order granting or denying a motion for summary judgment the appellate court will consider only evidence and issues called to the attention of the trial court." RAP 9.12. An argument neither pleaded nor argued to the trial court cannot be raised for the first time on appeal. *Sourakli v. Kyriakos, Inc.*, 144 Wn. App. 501, 509, 182 P.3d 985 (2008), *review denied*, 165 Wn.2d 1017 (2009).

---

[8] Section 6(c)(ii) of the master agreement, the section relied on by Silverhawk, does not say that an additional termination event "generates" an early termination date. It does not say how an early termination date occurs. It says what happens if an early termination date occurs or is designated. Market quotations will be used "If an Early Termination Date occurs." Section 6(e). KeyBank "may" designate an early termination date if an additional termination event occurs. Section 6(b)(iii). Even if the early payoff of the loan was "an additional termination event," which KeyBank denies, KeyBank did not designate an early termination date.

Because Silverhawk did not present its analysis of the contract to the trial court, this court will not consider it.

¶19 Silverhawk makes several other arguments for the first time in its reply brief, including (1) the master agreement is ambiguous; (2) if KeyBank has the exclusive right to terminate the swap, the provision for an additional termination is meaningless; (3) KeyBank's e-mails constituted notice of an early termination date; (4) Silverhawk's prepayment of the loan created an automatic early termination date or, alternatively, an "event of default," which triggered an early termination date; (5) the sale of the Auburn property constituted liquidation of Silverhawk, triggering an automatic early termination date; and (6) the master agreement was unconscionable. This court does not consider issues raised for the first time in a reply brief. RAP 10.3(c); *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992).

¶20 Because the parties had not previously agreed on terms that would control the calculation of the fee to be paid for terminating the swap before its maturity, Silverhawk's desire to terminate the swap early required them to reach a new agreement on that amount. This they did by agreeing that Silverhawk would pay $123,167 to be released from the swap, an agreement that as a matter of law constituted an accord and satisfaction of a bona fide dispute. "When an accord is fully performed, the previously existing claim is discharged and all defenses and arguments based on the underlying contract are extinguished." *Paopao*, 145 Wn. App. at 46. We conclude Silverhawk failed to raise a genuine issue of material fact showing that the underlying contract was applicable.

¶21 KeyBank requests attorney fees on appeal on the basis that Silverhawk's appeal is frivolous. "An appeal is frivolous if no debatable issues are presented upon which reasonable minds might differ, and it is so devoid of merit that no reasonable possibility of reversal exists." *Chapman v. Perera*, 41 Wn. App. 444, 455-56, 704 P.2d 1224, *review*

*denied*, 104 Wn.2d 1020 (1985). We do not regard the appeal as frivolous, and we decline to award fees on this basis.

¶22 Citing the doctrine of mutual remedy,[9] KeyBank also requests fees under a provision of the master agreement referred to in Silverhawk's complaint. KeyBank characterizes the provision as authorizing an award of attorney fees incurred to enforce rights under the agreement or fees related to the early termination of a swap transaction. The provision is not that broad. It states:

> A Defaulting Party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees, incurred by such other party by reason of the enforcement and protection of its rights under this Agreement.[10]

KeyBank does not allege or argue that Silverhawk is a defaulting party. Therefore, under the plain language of the attorney fee provision, KeyBank is not entitled to an award of attorney fees on appeal.

¶23 Affirmed.

Cox and SPEARMAN, JJ., concur.

---

[9] *See Kaintz v. PLG, Inc.*, 147 Wn. App. 782, 789, 197 P.3d 710 (2008) ("principle of mutuality of remedy authorizes the award of attorney fees where a party prevails in an action brought on a contract that contains a bilateral attorney fee clause . . . by establishing the invalidity or unenforceability of the contract").

[10] Clerk's Papers at 62 (agreement).