**Kenneth SULLIVAN, Plaintiff,**

v.

**TROPICAL TUNA, INC., Defendants.**

**Civil Action No. 95–12767–WGY.**

United States District Court,
D. Massachusetts.

Jan. 21, 1997.

David F. Anderson, Latti Associates, Boston, MA, for Plaintiff.

Thomas E. Clinton, Arthur P. Skarmeas, Clinton & Muzyka, Boston, MA, for Defendant.

## *MEMORANDUM AND ORDER*

YOUNG, District Judge.

Kenneth Sullivan ("Sullivan") brought this maritime action against Tropical Tuna, Inc. ("Tropical Tuna") to recover for injuries he suffered while serving aboard a vessel owned by Tropical Tuna. The Jones Act, negligence, and unseaworthiness counts were tried to a jury, and the maintenance and cure claims were tried to the Court. The jury returned a verdict for Tropical Tuna, but the Court found Tropical Tuna owed Sullivan $9,000.00 in maintenance and cure and assessed attorneys fees of $3,000.00 for the willful failure to make such payments for cure in a timely fashion.

Tropical Tuna now brings a timely motion pursuant to Fed.R.Civ.P. 59 to "alter" the Court's judgment by vacating it and rendering judgment in its favor on the damages and attorneys fees assessed for the willful failure to pay cure.

## I. BACKGROUND

Pursuant to Fed.R.Civ.P. 52(a), the Court makes the following factual findings:

On October 23, 1995, Sullivan injured the little finger on his left hand while performing his regular duties as a deck hand aboard the MARY T, a fishing vessel owned by Tropical Tuna. After the ship returned to port on October 30, 1995, Tropical Tuna immediately advanced Sullivan $1,000.00 in lieu of paying daily maintenance. While the Court finds this sum was somewhat inadequate—and has assessed damages for the difference—no willful failure to pay maintenance is implicated in this case.

With respect to his injured finger, Sullivan was first examined by a general practitioner, then referred to an orthopedist, and ultimately sent to a hand surgeon, Dr. Richard Fox ("Dr. Fox"). Dr. Fox examined Sullivan on November 30, 1995, and recommended that he undergo a surgical procedure called arthrodesis. The surgery was initially scheduled for December 8, 1995, but was postponed when Dr. Fox's office could not obtain pre-approval over the telephone from Tropical Tuna's insurance adjuster agency, Marine Safety Consultants, Inc. (the "insurer").

Sullivan's attorney sent a written demand for "immediate payment of maintenance and cure" to Tropical Tuna on December 4, 1995, and to Tropical Tuna's insurer on December 6, 1995. Exs. 16, 21. On December 8, 1995, Tropical Tuna's insurer sent a response to Sullivan's attorney stating that it had not "at any time refuse[d] to make any payments to Dr. Fox," but rather had denied Dr. Fox's request for pre-approval of Sullivan's surgery because: 1) it had only recently received the assignment to conduct an investigation into Sullivan's claim; and 2) an insurer lacks the authority to authorize medical treatment— "[t]hat is a matter between the patient and the physician." Ex. 23 (emphasis omitted). On December 22, 1995, Sullivan filed this suit against Tropical Tuna.

On January 3, 1996, one month after Sullivan made his written demand for payment of maintenance and cure, Tropical Tuna's insurer authorized payment for the surgery. Dr.

Fox successfully performed the procedure on January 12, 1996.

## II. DISCUSSION

█ General maritime law requires "shipowners to ensure the maintenance and cure of seamen who fall ill or become injured while in the service of the ship." *LeBlanc v. B.G.T. Corp.*, 992 F.2d 394, 396 (1st Cir.1993) (internal citations omitted). "The term 'maintenance and cure' refers to the provision of, or payment for, food and lodging ('maintenance') as well as any necessary health-care expenses ('cure') incurred during the period of recovery...." *Id.* at 397. The doctrine "derives from the 'unique hazards [which] attend the work of seamen,' and fosters the 'combined object of encouraging marine commerce and assuring the well-being of seamen.'" *Vella v. Ford Motor Co.*, 421 U.S. 1, 3–4, 95 S.Ct. 1381, 1383, 43 L.Ed.2d 682 (1975) (quoting *Aguilar v. Standard Oil Co.*, 318 U.S. 724, 727, 63 S.Ct. 930, 932, 87 L.Ed. 1107 (1943)).

### A. Insufficient Maintenance

█ A shipowner's duty to pay maintenance and cure extends only until the plaintiff fully recovers from his injuries or his condition is diagnosed as permanent. *Vella,* 421 U.S. at 4–5, 95 S.Ct. at 1383–84; *Hubbard v. Faros Fisheries Inc.,* 626 F.2d 196, 202 (1st Cir.1980). It is undisputed that Sullivan's injury occurred on October 23, 1995, and that it had fully healed by April 8, 1996. Sullivan was thus entitled to receive maintenance payments from Tropical Tuna for a period of 160 days.

The Court finds that the cost of Sullivan's reasonable maintenance over this 160–day period was an average of $18.70 per day, or a total of $2,992.00. To date, Tropical Tuna has made maintenance payments of $1,600.00, an average of $10.00 per day. Accordingly, as to the maintenance claim, judgment entered for Sullivan in the amount of $1,392.00. The Court rules that Tropical Tuna's failure to make adequate maintenance payments was not in any way willful.

## B. Willful Failure to Pay Cure

Sullivan acknowledges that Tropical Tuna has now paid all of his medical bills, but asserts that Tropical Tuna's one-month delay in authorizing payment for his surgery constituted a willful failure to provide cure. As a result, Sullivan seeks to recover damages for the physical and mental pain and suffering he endured during the delay, as well as his attorney's fees. Tropical Tuna responds that its one-month delay in approving Sullivan's surgery did not constitute a willful failure to pay cure because it had no obligation to pay for Sullivan's medical treatment before it was actually performed.

 No court has ever directly confronted the question of whether the law of maintenance and cure requires a shipowner to guarantee payment prior to treatment.[1] However, as the Fifth Circuit recognized in *Guevara v. Maritime Overseas Corp.*, 59 F.3d 1496 (5th Cir.1995), *cert. denied* —— U.S. ——, 116 S.Ct. 706, 133 L.Ed.2d 662 (1996), "[t]he obligation to provide maintenance and cure 'embraces not only the obligation to pay a subsistence allowance and to reimburse the seaman for medical expenses he incurs; the employer must take all reasonable steps to insure that the seaman who is injured or ill receives proper care and treatment.'" *Id.* at 1500 (quoting Thomas J. Schoenbaum, *Admiralty and Maritime Law*, § 6–28, at 348 [2d ed.1994] ). In light of the realities of the current health care system, this Court observes that an injured seaman often will be unable to obtain necessary medical treatment unless he can first demonstrate the ability to pay. As a result, the Court holds that a shipowner's duty to pay maintenance and cure encompasses a duty to guarantee payment prior to treatment for all reasonable medical expenses. This ruling appropriately upholds the principle set forth in *Vaughan v. Atkinson*, 369 U.S. 527, 82 S.Ct. 997, 8 L.Ed.2d 88 (1962) that, in applying the law of maintenance and cure, ambiguities or doubts are to be resolved in favor of the seaman. *Id.* at 532, 82 S.Ct. at 1000–01 (internal citations omitted).

 This Court further holds that Tropical Tuna breached this duty by delaying one month before approving Sullivan's surgery, and that this breach was both unreasonable and willful. Sullivan sent written demand for maintenance and cure to Tropical Tuna on December 4, 1995, and to Tropical Tuna's insurer on December 6, 1996. "Upon receiving a claim for maintenance and cure, the shipowner need not immediately commence payments; he is entitled to investigate and require corroboration of the claim." *Morales v. Garijak, Inc.*, 829 F.2d 1355, 1358 (5th Cir.1987) (citation omitted). One month, however, was far longer than Tropical Tuna's insurer needed to conduct a reasonable investigation. In light of the "breadth and inclusiveness" of a shipowner's duty to pay maintenance and cure, *see Vella*, 421 U.S. at 4, 95 S.Ct. at 1383,[2] the only question for the insurer to investigate was whether Sullivan was in service of the ship at the time his injury occurred—a fact which this Court finds was never reasonably subject to doubt. The insurer could have obtained immediate corroboration of Sullivan's claim by contacting the master of the MARY T, Captain James Bodick. Even though Bodick was out at sea at the time Sullivan first notified Trop-

---

1. The one case cited by Tropical Tuna, *Dominguez v. Marine Transport Management Co.*, 1992 A.M.C. 2862 (E.D.La.1992), merely noted the issue. The *Dominguez* court stated in dicta that it "is unable to find a single precedent requiring that the maritime employer guarantee to pay for [medical] tests prior to such tests being done." *Id.* at 2863. By the same token, this Court is unable to find a single precedent holding that a maritime employer does not have such a duty.

2. The "breadth and inclusiveness" of a shipowner's duty to pay maintenance and cure "assure its easy and ready administration for '[i]t has few exceptions or conditions to stir contentions, cause delays, and invite litigations.'" *Vella*, 421 U.S. at 4, 95 S.Ct. at 1383 (quoting *Farrell v. United States*, 336 U.S. 511, 516, 69 S.Ct. 707, 710, 93 L.Ed. 850 [1949] ). This "duty arises irrespective of the absence of shipowner negligence and indeed irrespective of whether the illness or injury is suffered in the course of the seaman's employment." *Vella*, 421 U.S. at 4, 95 S.Ct. at 1383 (citing *Calmar S.S. Corp. v. Taylor*, 303 U.S. 525, 527, 58 S.Ct. 651, 652–53, 82 L.Ed. 993 [1938] ). "So broad is the shipowner's obligation … negligence or acts short of culpable misconduct will not relieve [the shipowner] of [ ] responsibility." *Aguilar v. Standard Oil Co.*, 318 U.S. 724, 730–31, 63 S.Ct. 930, 934, 87 L.Ed. 1107 (1943).

ical Tuna of his claim, this Court infers from the record before it that Tropical Tuna could have contacted Bodick via radio at any time.[3]

■■■■ Although Tropical Tuna's delay in authorizing Sullivan's surgery did not aggravate Sullivan's medical condition, the Court finds that it did cause Sullivan to endure a substantial amount of unnecessary pain and suffering. It is well-settled that a seaman may recover compensatory damages such as pain and suffering stemming from a shipowner's unreasonable failure to pay maintenance and cure. *See Vaughan,* 369 U.S. at 530–31, 82 S.Ct. at 999–1000; *O'Connell v. Interocean Management Corp.,* 90 F.3d 82, 84 (3d Cir.1996) (unreasonable refusal to pay claim for maintenance and cure may lead to compensatory damages); *Williams v. Kingston Shipping Co.,* 925 F.2d 721, 723 (4th Cir. 1991) (quoting 1B *Benedict on Admiralty* § 54, 4–92 [7th ed.1989] ) (failure to pay maintenance and cure gives rise to "money damages for any prolongation or aggravation of the physical injury suffered by the seaman"); *Morales,* 829 F.2d at 1358–59 (same); *Hines v. J.A. LaPorte, Inc.,* 820 F.2d 1187, 1190 (11th Cir.1987) (district court properly awarded damages reflecting, *inter alia,* the "prolonged [ ] pain and suffering" caused by defendant's improper termination of maintenance and cure payments); *Stevens v. Seacoast Co.,* 414 F.2d 1032, 1040 (5th Cir.1969) (if the failure to pay maintenance and cure "contributed in any degree to additional pain or disability or prolonged the recovery period," plaintiff may recover compensatory damages). Taking particular note of the uncertainty that Sullivan faced during the one-month delay as to whether he would ever be able to have the surgery to repair his finger, this Court awards Sullivan pain and suffering damages in the amount of $7,608.00. When this figure is combined with the $1,392.00 already assessed for inadequate maintenance payments, the total damage award for Sullivan's maintenance and cure claim comes to $9,000.00.

## C. Attorneys' Fees

■■■■ Sullivan is entitled to recover the reasonable attorneys' fees he incurred as a result of Tropical Tuna's willful failure to pay cure during the one-month delay—namely, the costs of putting the case in suit. In *Vaughan v. Atkinson,* 369 U.S. 527, 82 S.Ct. 997, 8 L.Ed.2d 88 (1962), the Supreme Court established an exception to the normal "American rule" that litigants must bear their own costs, holding that a seaman may "recover attorneys' fees as damages where a shipowner was callous, willful, or recalcitrant in withholding [maintenance and cure] payments." *Robinson v. Pocahontas,* 477 F.2d 1048, 1051 (1st Cir.1973) (citing *Vaughan,* 369 U.S. at 530, 82 S.Ct. at 999). Based upon the record before it, this Court finds that Tropical Tuna exhibited the requisite degree of willfulness by the refusal of its agents, Marine Safety Consultants, Inc., to authorize payment for Sullivan's surgery for over a month. "When a ship operator fails to make a prompt, good faith investigation of a seaman's claim for maintenance and cure, or otherwise takes a 'callous' or 'recalcitrant' view of its obligations, the seaman may recover legal expenses on top of maintenance and cure." *Rodriguez v. Bahama Cruise Line, Inc.,* 898 F.2d 312, 316 (2d Cir.1990).[4]

■■■■ The question of how to calculate a reasonable fee award is somewhat more complex. The First Circuit has never addressed the issue of how courts should calculate at-

---

3. Furthermore, the Court notes that the MARY T returned to port on December 22, 1995. Even if it was reasonable—and it was not—for Tropical Tuna to wait until then to seek corroboration of Sullivan's claim, Tropical Tuna has failed to provide any explanation for the twelve-day time lag between the date the vessel returned to port and Tropical Tuna's approval of the surgery on January 3, 1996.

4. The vast majority of cases in which courts have awarded attorneys' fees in this context involved a failure to pay maintenance and cure rather than a mere delay. *See, e.g., Vaughan,* 369 U.S. at 530–31, 82 S.Ct. at 999–1000; *Rodriguez,* 898 F.2d at 314–315; *Deisler v. McCormack Aggregates Co.,* 54 F.3d 1074, 1078 (3d Cir.1995). Nevertheless, the same principles apply; a shipowner who forces a seaman to incur the expenses of hiring a lawyer and filing a lawsuit in order to collect cure payments to which he is clearly entitled should not be absolved of all liability for attorneys' fees simply because it decides to pay cure before the case actually goes to trial.

torneys' fees in maintenance and cure cases, and other circuits are split on the issue. The Fourth Circuit, for example, applies the lodestar method that is used to calculate attorneys' fees in civil rights cases. *See Williams*, 925 F.2d at 723–24 (holding that because reasonableness is the crucial consideration in calculating attorneys' fees in both the admiralty and civil rights contexts, it is appropriate to apply the lodestar approach contained in 42 U.S.C. § 1988 to admiralty cases even though, "[s]trictly speaking, the fee award in admiralty is an element of damages whose source is judicial precedent, not a fee-shifting statute"); *see also Morales*, 829 F.2d at 1361 (dictum recommending use of lodestar approach in maintenance and cure claims). The Ninth Circuit, by contrast, does not apply the lodestar approach outside of the civil rights realm, and instead requires courts to consider the following factors in determining reasonable attorneys' fees for a maintenance and cure claim:

> (1) the time and labor required, (2) the novelty and difficulty of the questions involved, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the undesirability of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases.

*Glynn v. Roy Al Boat Management Corp.*, 57 F.3d 1495, 1501 & n. 8 (9th Cir.1995) (citing *Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 70 [9th Cir.1975] ), *cert. denied* —— U.S. ——, 116 S.Ct. 708, 133 L.Ed.2d 663 (1996). The factors enumerated by the Ninth Circuit generally resemble those that the Supreme Judicial Court of Massachusetts requires courts to consider when awarding attorneys' fees pursuant to Mass.Gen.L. ch. 93A. *See Linthicum v. Archambault*, 379 Mass. 381, 388–89, 398 N.E.2d 482 (1979) ("While the amount of a reasonable attorney's fee is largely discretionary, the judge ... should consider the nature of the case and the issues presented, the time and labor required, the amount of damages involved, the result obtained, the experience, reputation and ability of the attorney, the usual price charged for similar services by other attorneys in the same area, and the amount of awards in similar cases.") (internal citations omitted).

This Court holds that the Ninth Circuit approach is the more persuasive one. After considering the factors set forth in *Glynn*, the Court rules that reasonable attorneys' fees for the cost of putting this case in suit come to $3,000.00, a sum which serendipitously works out to one-third of the $9,000.00 in compensatory damages already awarded. This fee award also reflects the fact that initiating a federal lawsuit today requires a great deal of investigation and start-up costs. *See* Fed.R.Civ.P. 11, (sanctions); Fed. R.Civ.P. 26(a)(1) (mandatory disclosure); Local Rule 26.1 (control of discovery),[5] Local Rule 16.1 (initial case management scheduling conference); District of Massachusetts Expense and Delay Reduction Plan, Comment to Rule 1.02 (Early Assessment of Cases).[6]

---

5. So complex is the matter of mandatory disclosure that, in this district, it has spawned a 72–page *Manual for Pre-Discovery Disclosure* (Conley & Hodge Associates, Inc.1994).

6. Parenthetically, it is worth noting that the constantly rising costs of litigation have long been a concern both to the bench and the bar. *The Federal Court Speaks: District Judges Sound Off About Rule 11, Discovery Disputes, Discovery Edge*, Fall 1994, at 4 ("These rules tend to front load your costs."); Kenneth J. Withers, *Pre-Discovery Disclosure Under the Massachusetts Local Rules*, Boston B.J., Nov./Dec.1994, at 7, 18 ("[T]here is no escaping the fact that ... expenses, justifiable over the course of litigation, are [now] incurred in a shorter span of time at the outset of the case.... [Even] the question of ethical conflicts is minor in the minds of many clients, when faced with the accelerated litigation costs involved in [mandatory] disclosure.").

The District of Massachusetts has "tried to create baselines for analyzing the efficacy of [its] plan[]," Carl Tobias, *Civil Justice Reform Roadmap*, 142 F.R.D. 507, 509 & n. 12 (1992), and to this end commissioned an entirely independent study. That study, prepared by Professor Charles Sorenson of the New England School of Law, revealed no appreciable savings to litigants from the District of Massachusetts Expense and Delay Reduction Plan. Charles Sorenson, Massa-

## III. CONCLUSION

For the foregoing reasons, judgment properly entered for Sullivan in the amount of $9,000.00 compensatory damages and $3,000.00 attorneys' fees on the maintenance and cure claim. The jury verdict for Tropical Tuna on all other aspects of this case, i.e. on the Jones Act and unseaworthiness claims, shall, of course, stand. The motion to alter the judgment is DENIED.

chusetts Expense and Delay Reduction Plan Study Report: Comment Draft (Mar.1996) (unpublished study on file in these chambers). Professor Sorenson's conclusions are now confirmed nationwide. *See* RAND Study, James S. Kakalik et al., Just Speedy and Inexpensive? An Evaluation of Judicial Case Management Under the Civil Justice Reform Act 16–17 (Sept.1996) (RAND Institute for Civil Justice, unpublished report prepared for the Judicial Conference of the United States) (concluding that the Expense and Delay Reduction Plans followed by the federal district courts do not, in fact, reduce litigant expenses at all but actually increase expenses for all but the most lengthy cases). These heavy upfront expenses are the single most determinative factor in leading those litigants who have a choice to seek dispute resolution in the already swamped Massachusetts state courts rather than in this forum.