249 P.3d 1030 (2011)
TUYEN THANH MAI, Respondent,
v.
AMERICAN SEAFOODS COMPANY, LLC, a Delaware limited liability company; and Northern Hawk, LLC, a Delaware limited liability company, Appellants.
No. 63969-2-I.
Court of Appeals of Washington, Division 1.
March 14, 2011.
*1032 Anthony John Gaspich, Gaspich & Williams PLLC, Seattle, WA, Russell R. Williams, Gaspich & Williams PLLC, Seattle, WA, for Appellants.
Richard John Davies, Robert M. Kraft, Kraft Palmer Davies PLLC, Seattle, WA, for Respondent.
LEACH, A.C.J.
¶ 1 American Seafoods Co. LLC and Northern Hawk LLC (collectively, ASC) appeal a judgment for maintenance, compensatory damages, and attorney fees awarded because they failed to pay maintenance and cure to Tuyen Thanh Mai. ASC contends it had no obligation to pay maintenance and cure during the period of time Mai refused to attend an independent medical examination (IME) as requested by ASC. ASC also asserts that insufficient evidence supports the trial court's award of compensatory damages and attorney fees.
¶ 2 We hold that, under the facts of the case, ASC could not condition Mai's receipt of maintenance and cure upon her attendance at an IME. We also holdthat substantial evidence supports the trial court's findings that ASC withheld maintenance and cure unreasonably, arbitrarily, and willfully. We therefore affirm the trial court's award of maintenance, compensatory damages, and attorney fees.

FACTS
¶ 3 On March 29, 2005, Mai injured her left knee while off-loading 40-pound boxes of frozen seafood from the F/T Northern Hawk. Off-loading involves moving the boxes from a box elevator, then to an incline conveyor, and then to a dock conveyor. Workers lift the boxes off the dock conveyor and load them onto nearby pallets. Mai was working near the transfer point between the incline conveyor and dock conveyor when the two conveyors became misaligned. A box slid from the incline conveyor and struck Mai in her left knee, causing her immediate pain.
¶ 4 On April 1, Mai reported that her left knee was still swollen and painful. Dr. Charles Peterson began treating Mai five days later. Dr. Peterson noted that Mai *1033 suffered "pain and swelling in the knee and it clicks and pops and [has] difficulty working." After administering a McMurray's test,[1] he ordered an MRI (magnetic resonance imaging) scan. Dr. Peterson diagnosed Mai with a degenerative medial meniscus with a probable tear.
¶ 5 Dr. Peterson performed a left knee arthroscopy and medial meniscectomy without complication. During the surgical procedure, he found a horizontal tear and a tear in the posterior half of Mai's medial meniscus. Postsurgery, Mai engaged in physical therapy and began using a knee brace. On August 4, Mai reported to Dr. Peterson that she had tried to return to work but suffered from increased pain and swelling. Dr. Peterson prescribed a new knee brace. At a follow-up appointment, Mai reported that the new brace had not helped very much. Dr. Peterson recommended that she have the brace adjusted and noted that, though she was not yet released for work, Mai could work as a night watch when the boat returned.
¶ 6 ASC arranged for Mai to have a second MRI with orthopedist Jonathan L. Franklin in October 2005. Dr. Franklin's examination noted tenderness in the medial and posteromedial joint line, a painful McMurray's test, and pain with full flexion of the left knee. The MRI scan also revealed a tear in the remaining body of the medial meniscus.
¶ 7 Later that year, Mai left Seattle for California, where she sought treatment from Dr. Bert Tardieu, who had previously treated her for injuries to her right knee. In December, Dr. Tardieu noted diffuse swelling, synovial thickening, and tenderness in Mai's medial compartment of the left knee. Dr. Tardieu examined the MRI results obtained by Dr. Franklin and noted that Mai might still have a meniscus tear but recommended she try more conservative treatment options before surgery. Mai returned to Dr. Tardieu in January 2006, still complaining of painful popping in the knee joint. In March 2006, Dr. Tardieu performed surgery and found a complex tear of the medial meniscus and excised the torn fragments.
¶ 8 After surgery, Mai continued to experience discomfort in her left knee. On September 22, 2006, Dr. Tardieu observed that "it is clear that even with the knee brace on, she will not be safe for unsteady or uneven walking surfaces." Dr. Tardieu prescribed a gym membership to develop strength in her lower left leg and to delay her total knee arthroplasty.
¶ 9 ASC abruptly ended maintenance and cure payments in November 2006. In a letter dated December 4, ASC's counsel wrote,
Enclosed is American Seafoods' check no. 134921 in the amount of $375.00 paying maintenance to Ms. Tuyen for the period of November 16th through November 30, 2006.
It is unclear whether Ms. Tuyen is entitled to continue to receive maintenance & cure, as her "treatment" over the past few months has consisted of going to a gym and taking pain medication. The last couple of chart notes indicate that her condition is neither improving nor worsening. It is unclear whether anything she is currently doing is curative.
It will be necessary to obtain an explanation from her treating physician Dr. Tardieu as to the nature of her treatment before any further maintenance & cure benefits will be paid.
¶ 10 On December 15, Dr. Tardieu noted that Mai was "a total knee candidate" but that she "should keep forestalling" and "delay [the procedure] as long as possible" by taking anti-inflammatory drugs, exercise, and by wearing the knee brace. In Dr. Tardieu's opinion, Mai was "permanently disabled from ever returning to her work as an ocean-going fisherman or fish preparation employee."
¶ 11 On April 5, 2007, ASC's counsel wrote a letter, stating,
Dr. Tardieu has diagnosed [Ms. Tuyen] with bilateral degenerative arthritis of the knees. For quite some time now, he has prescribed physical therapy and medication for this condition. . . .
The medical evidence indicates that her treatment is palliative in nature. Under these circumstances, Ms. Tuyen is no longer *1034 entitled to payment of maintenance and cure.
We understand Dr. Tardieu believes Ms. Tuyen is a candidate for a total knee replacement. Such surgery is obviously curative in nature. Should Ms. Tuyen decide to have the surgery, it would be covered by maintenance and cure.
¶ 12 On May 1, Dr. Tardieu observed that Mai was not making significant progress and recommended Mai proceed with the total knee replacement (TKR) procedure. On May 16, ASC received a request to pay for a TKR, which was tentatively scheduled for June 11.
¶ 13 Five days before surgery, ASC faxed notice that it would not pay for the procedure. Instead, ASC insisted that Mai undergo an IME with Dr. Franklin in Seattle. In a letter to Mai's attorney, ASC's attorney explained his client's sudden refusal to approve surgery,
[T]he surgery was first discussed last year, but Ms. Tuyen took no action nor showed any interest in pursuing it. In any event, American Seafoods wishes to investigate the request for this surgery before providing approval, given the drastic nature of the procedure.
We understand Ms. Tuyen has had symptoms for some time relating to her left knee. She has undergone two prior surgeries. It may very well be that total knee replacement is the logical next step. If so, as previously mentioned, the procedure would be curative in nature and covered by maintenance and cure. However, given the drastic nature of this surgery, American Seafoods wants an independent evaluation to determine whether Ms. Tuyen has reached the point of requiring it and whether any alternative treatment, short of such surgery, is available and recommended.
¶ 14 Upon receiving this fax, Mai's attorney placed a call to its author, ASC's counsel, and memorialized their phone conversation with a letter. This letter states that Mai's lawyer recommended that she not attend the IME. It also provides,
In discussing the "second opinion" issue, you told me that if a court were asked to decide, "We [ASC] lose" on the issue of allowing Ms. Tuyen to proceed without any second opinion. . . . You gave me two reasons why ASC desired the second opinion: First, "[approximately] $60,000.00 for surgery is a lot of money." Second, "ASC foresees litigation in Seattle of Ms. Tuyen's personal injury claims and ASC wishes to have a doctor ASC could readily produce at trial as an expert witness." You did say that ASC would start paying Ms. Tuyen her Maintenance as of Monday, June 11, 2007.
¶ 15 On June 29, ASC filed a declaratory judgment action in federal district court. Mai then hired her current counsel and filed this action in state court for damages under the Jones Act[2] and general maritime law. ASC later dismissed the federal action.
¶ 16 In December, Mai underwent a CR 35(a) medical examination with Dr. Peter R. Mandt at the request of ASC. Dr. Mandt concluded that TKR was a reasonable treatment option and that Mai's medial compartment problems were "accelerated from the injury as the injury likely caused the meniscus tear."
¶ 17 ASC finally approved surgery on January 22, 2008. At the end of January, ASC paid maintenance for the period from May 18, 2007, to June 30, 2007, and from January 1, 2008, to January 16, 2008, but refused to pay maintenance for the period from July 2007 to December 2007. Mai underwent surgery on February 4, 2008.
¶ 18 A bench trial resulted in judgment in Mai's favor. The court found that "the steps taken by ASC after the knee replacement had been authorized were not reasonable," and concluded that "[ASC's] conduct and refusal to pay maintenance and cure was willful, persistent and unreasonable." The court awarded Mai $4,600.00 in back maintenance for the period from July 2007 to December 2007, $10,000.00 in compensatory damages, $35,000.00 in future general damages, $75,000.00 in past general damages, $56,317.00 in future loss of income, *1035 $108,192.00 in past loss of income, and $11,612.24 in attorney fees and costs.
¶ 19 ASC appeals.

STANDARD OF REVIEW
¶ 20 We review a trial court's findings of fact and conclusions of law under a two-step process. We first determine whether substantial evidence in the record supports the findings of fact and, if so, whether those findings support the conclusions of law.[3] "Substantial evidence exists if a rational, fair-minded person would be convinced by it."[4] We review questions of law de novo.[5]

ANALYSIS[6]
¶ 21 ASC contends the trial court applied the wrong legal standard when it determined that ASC owed Mai back maintenance from July 2007 to December 2007 and that its "wrongful failure to timely pay maintenance and cure was unreasonable, willful and persistent." ASC also challenges the sufficiency of the evidence for the court's award of compensatory damages and attorney fees. We address each argument below.
¶ 22 Maritime common law requires that a shipowner pay a seaman a daily subsistence allowance (maintenance) and medical treatment (cure) when the seaman becomes ill or injured in the service of a vessel.[7] A seaman establishes her right to maintenance and cure by alleging and proving by a preponderance of the evidence (1) her engagement as a seaman; (2) her illness or injury occurred, manifested, or was aggravated while in the ship's service; (3) the wages to which she is entitled; and (4) the expenditures for medicines, medical treatment, board, and lodging.[8] Notably, a seaman need not present any proof of negligence or fault on the part of her employer nor must she prove a causal nexus between employment and injury to establish her entitlement to maintenance and cure.[9]
¶ 23 Once established, the seaman's entitlement continues until she reaches maximum medical recovery or maximum cure.[10] Maximum cure is the point at which "it appears probable that further treatment will result in no betterment of the seaman's condition."[11] It is the point at which "`it appears that the seaman's condition is incurable, or that future treatment will merely relieve pain and suffering but not otherwise improve the seaman's physical condition.'"[12] The employer bears the burden of proving that maximum *1036 cure has occurred.[13]
¶ 24 In Vaughan v. Atkinson,[14] the United State Supreme Court stated that all ambiguities and doubts as to the seaman's right to receive maintenance and cure are to be resolved in the seaman's favor. This rule applies to conflicting but credible medical testimony as to whether the seaman has reached maximum cure.[15] Thus, a seaman's right to maintenance and cure generally continues until a maximum cure determination is both unequivocal and made by a qualified medical expert.[16]
¶ 25 Damages caused by a wrongful denial of maintenance and cure are decided according to "`an escalating scale of liability.'"[17] If a vessel owner is in fact liable for maintenance and cure but reasonably rejected the seaman's claim, the owner incurs liability only for the amount of maintenance and cure owed.[18] But if the vessel owner's refusal was unreasonable, then the owner incurs liability for compensatory damages in addition to maintenance and cure.[19] And if the vessel owner acts not only unreasonably but in a "callous and recalcitrant, arbitrary and capricious, or willful, callous and persistent" manner, the owner incurs additional liability for punitive damages and attorney fees.[20]
¶ 26 Applying these principles to this case, Mai met her burden of proving the elements of her maintenance and cure claim. The parties agree that Mai, a seaman, worked in the service of F/T Northern Hawk when her knee became symptomatic in March 2005. The parties also agree that Dr. Tardieu recommended TKR surgery for Mai's condition as early as December 2006. Furthermore, ASC's attorney wrote a letter in April 2007 stating that TKR surgery was "obviously curative in nature" and that "[s]hould Ms. Tuyen decide to have the surgery, it would be covered by maintenance and cure." And in June 2007, ASC's attorney again acknowledged that TKR was "curative in nature and covered by maintenance and cure." He made no claim that Mai had reached maximum cure. Neither did he assert any recognized defense to the payment of maintenance and cure.[21] Instead, he described the purpose of the IME as follows,
However, given the drastic nature of this surgery, American Seafoods wants an independent evaluation to determine whether Ms. Tuyen has reached the point of requiring it and whether any alternative treatment, short of such surgery, is available and recommended.
¶ 27 In other words, ASC did not dispute Mai's need for further medical treatment but claimed to be demanding an IME to explore the availability of alternative treatment less expensive than surgery. When Mai declined the IME, ASC took the position that Mai had *1037 waived any right to maintenance and cure for the period from July 1, 2007, until her submission to an IME. ASC continued to refuse to pay for this period even after its IME physician agreed that the proposed knee replacement surgery was "a reasonable thing to do."[22]
¶ 28 ASC contends its right under maritime law to investigate Mai's claim allowed it to demand that Mai attend an IME before it paid additional maintenance and cure. Thus, according to ASC, Mai waived her entitlement to maintenance during the time she failed to cooperate with its IME request. We disagree.
¶ 29 While maritime law imposes an obligation on a vessel owner to investigate a claim before denying or terminating benefits,[23] a vessel owner may refuse to pay maintenance and cure only "if a diligent investigation indicates that the seaman's claim is not legitimate or if the seaman does not submit medical reports to document his claim."[24] However, reported maritime law decisions provide little support for ASC's claim that the scope of that investigation goes so far as to allow a shipowner to avoid maintenance and cure liability under the facts of this case.
¶ 30 For instance, in Sullivan v. Tropical Tuna, Inc.,[25] a deck hand injured his finger aboard a fishing vessel, and the shipowner's insurer refused to preapprove surgery because it had not yet investigated the claim. Finding that this constituted a willful failure to pay cure, the court reasoned that "[i]n light of the `breadth and inclusiveness' of a shipowner's duty to pay maintenance and cure, the only question . . . to investigate was whether [the seaman] was in service of the ship at the time his injury occurred."[26] And in Bloom v. Weeks Marine, Inc.,[27] the employer argued, as does ASC, that it had "`an undisputed legal right, and in fact legal obligation, to conduct a maintenance and cure medical examination.'" The court disagreed, ruling that a shipowner may be entitled "`to monitor the seaman's medical condition to determine when cure has occurred,'"[28] but the right to monitor does not "include[] the right to have [an] expert witness physician examine [the seaman] pursuant to a `maintenance and cure' exam."[29] Together, these cases appear to foreclose the possibility of requesting an IME under the facts of this case.
¶ 31 ASC disagrees, citing Morales v. Garijak, Inc.[30] and Estelle v. Berry Bros. General Contractors, Inc.[31] But these cases do not support its position. Although Morales holds that a vessel owner may investigate and require corroboration of a claim, the shipowner in Morales did not appeal the threshold determination that the seaman was entitled to maintenance and cure.[32] Instead, the shipowner challenged the length of time that maintenance was owed and the sufficiency of the evidence regarding the jury's finding that it acted arbitrarily in failing to pay benefits.[33]Morales, therefore, does not support the assertion that a shipowner may demand an IME before paying a seaman maintenance. Rather, Morales suggests that a vessel owner owes maintenance when its investigation establishes that a seaman's claim is legitimate, i.e., that she presented credible evidence of an injury suffered in the course of *1038 her employment and of the expenses incurred as a result of that injury.
¶ 32 Estelle is also inapposite. In an unpublished order, the federal district court dismissed the seaman's summary judgment motion after concluding that "the vessel owner is entitled to investigate and require corroboration of the claim," including "the right to seek [an] independent medical evaluation."[34] But, unlike this case, the employer in Estelle openly questioned the qualifications of the individual from whom the seaman received treatment.[35] Because ASC does not challenge Dr. Tardieu's qualifications as a physicianindeed, ASC paid Mai maintenance for almost an entire year during which she received uninterrupted treatment from himEstelle is factually distinguishable and does not apply here.
¶ 33 Furthermore, given the lack of any challenge to Dr. Tardieu's qualifications and expertise, we have difficulty understanding how the requested IME would have provided sufficient information to support a denial of the requested surgery. At best, it would have provided ASC with a competing recommendation for treatment of a condition acknowledged to require medical care. In light of the deference given to a seaman in this context under Vaughan, the requested IME appears insufficient to support a denial of the treatment proposed by the seaman's treating physician.
¶ 34 We reject ASC's argument for one additional reasonit is squarely at odds with the solicitous attitude federal courts have adopted toward seamen.[36]
¶ 35 The United States Supreme Court has explained that the duty to pay maintenance and cure is "[a]mong the most pervasive incidents of the responsibility anciently imposed upon a shipowner."[37] It serves the "combined object of encouraging marine commerce and assuring the well-being of seamen."[38] These aims are accomplished by providing seamen with "essential certainty of protection against the ravages of illness and injury."[39] The duty to pay maintenance and cure is "so inclusive as to be relatively simple, and can be understood and administered without technical considerations. It has few exceptions or conditions to stir contentions, cause delays, and invite litigation."[40] ASC withheld payment for vital medical treatment pending an IME. It claimed to be searching for cheaper alternative treatment but actually intended to develop expert testimony for anticipated litigation. This conduct frustrates these goals and invites uncertainty, delay, and litigation.[41]
¶ 36 For the foregoing reasons, we conclude an IME could not be required where, as here, the seaman established her prima facie burden, the vessel owner agreed to pay maintenance and cure, the owner did not question the need for some course of medical treatment or the expertise of the treating physician, and the owner recognized the prescribed course of treatment as curative in nature. Because ASC does not challenge the amount of maintenance awarded, we affirm the trial court's award of $4,600 in back maintenance.
¶ 37 ASC also disputes whether substantial evidence supports the finding that the falling 40-pound box proximately caused the injury that led to surgery. As explained above, a causal nexus between employment and injury is irrelevant to ASC's maintenance and cure liability. However, to support her Jones Act claim, Mai was required to present expert medical testimony articulating "more than a mere possibility that a causal relationship exists between the defendant's *1039 negligence and the injury for which the plaintiff seeks damages."[42] The testimony of Dr. Tardieu met this standard.
¶ 38 We next turn to ASC's challenge to the award of compensatory damages and attorney fees. ASC claims that the record contained insufficient evidence to support a finding that it acted unreasonably, willfully, and persistently by withholding benefits. According to ASC, it had a reasonable basis for questioning Dr. Tardieu's TKR recommendation, and it proceeded in a diligent manner to investigate Mai's claim. Again, we disagree.
¶ 39 To recover a claim for compensatory damages and attorney fees, the seaman bears the burden of proving that her employer failed to pay maintenance and cure and that this failure was not only unreasonable but callous and recalcitrant, arbitrary and capricious, or willful, callous and persistent.[43] Examples of this more egregious form of conduct include (1) failing to conduct any investigation at all before denying a seaman's claim, (2) withholding payment despite discovering through investigation that payment was due, (3) rejecting a documented claim because the seaman did not consult with the owner before treatment and because the seaman filed suit, or (4) withholding payment on a pretextual basis.[44]
¶ 40 This case is similar to Parker v. Texaco, Inc.,[45] where the employer refused to pay a seaman's medical bill even though it possessed a report from a treating physician that clearly related the seaman's hospitalization to injuries resulting from the seaman's accident. The court determined that the failure to pay cure under these circumstances "was clearly unreasonable, and even fell to the level of being arbitrary and capricious."[46]
¶ 41 Here, ASC withheld maintenance and refused to authorize the TKR even though it had notice that Mai received long-term treatment for her knee and that Dr. Tardieu suggested Mai was a candidate for TKR as far back as September 2006. In April 2007 and again in June 2007, ASC recognized that the procedure was curative in nature. ASC also had access to two years of medical examinations and had paid Mai's treating physicians without questioning their qualifications. Yet, ASC abruptly challenged the need for TKR surgery despite the fact that none of the treating physicians ever indicated that Mai had reached maximum cure. The trial court could reasonably conclude from the evidence that the true reason for this challenge was a desire to develop expert testimony for anticipated litigation, rather than any serious question about Mai's need for the TKR.
¶ 42 Nevertheless, ASC claims that its refusal to preapprove surgery and withhold maintenance was reasonable because the claims adjuster became aware of the TKR recommendation in May 2007, knew from the medical records that Mai suffered from a degenerative disease in her knee joint, and that a TKR is not usually warranted until a patient exhibits severe degenerative changes in at least two compartments of the knee. We find this argument unpersuasive. First, the same medical records that informed the claims adjuster of Mai's preexisting condition also contained the earlier recommendation for the TKR. Second, whether the arthritic condition in Mai's knee led to the TKR recommendation is irrelevant as a seaman is entitled to recover for a preexisting condition that manifests itself while the seaman is in the ship's service.[47] Third, when a party challenges the sufficiency of the evidence, we do not reweigh the evidence or rebalance competing testimony and inferences.[48] Instead, we review the record in the light most favorable to the party *1040 who prevailed in the court below.[49] Because ample evidence supports the trial court's findings, we affirm.
¶ 43 In a related argument, ASC asserts that it should not be held liable for compensatory damages and attorney fees because it filed a declaratory judgment action to determine its obligation to pay maintenance and cure. While ASC correctly notes that a declaratory judgment action is an acceptable vehicle by which a vessel owner may determine its maintenance and cure obligations,[50] we also note that a purpose of the Declaratory Judgment Act[51] is "to provide a means of settling an actual controversy before it ripens into a violation of the civil or criminal law, or a breach of a contractual duty."[52] In this case, ASC filed its action nearly two years after Mai presented her claim for maintenance and cure, eight months after Dr. Tardieu recommended Mai for a TKR, and nearly three weeks after ASC denied Mai's request to pay for the procedure. Taking this history into consideration, we reject ASC's claim.
¶ 44 Mai requests attorney fees on appeal.[53] "RAP 18.1(b) requires `[a]rgument and citation to authority' as necessary to inform the court of grounds for an award."[54] Because the trial court found that ASC's actions were "unreasonable, willful and persistent," she is entitled to recover attorney fees. We grant her request subject to compliance with RAP 14.4.

CONCLUSION
¶ 45 Because ASC had no right to withhold payment of maintenance until Mai submitted to an IME, she was entitled to maintenance from June 2007 to December 2007. Substantial evidence supports the court's findings that ASC wrongfully withheld maintenance in an arbitrary, willful, and persistent manner. We therefore affirm the awards of maintenance, compensatory damages, and attorney fees.
WE CONCUR: SPEARMAN and APPELWICK, JJ.
NOTES
[1] A McMurray's test detects meniscus tears.
[2] 46 U.S.C. §§ 30104, 30105.
[3] Panorama Vill. Homeowners Ass'n v. Golden Rule Roofing, Inc., 102 Wash.App. 422, 425, 10 P.3d 417 (2000).
[4] In re Estates of Palmer, 145 Wash.App. 249, 265-66, 187 P.3d 758 (2008).
[5] Endicott v. Icicle Seafoods, Inc., 167 Wash.2d 873, 880, 224 P.3d 761, cert. denied, ___ U.S. ___, 130 S.Ct. 3482, 177 L.Ed.2d 1059 (2010).
[6] Mai brought her action in state court under the "saving to suitors" clause in 28 U.S.C. § 1333(1), the Jones Act, 46 U.S.C. §§ 30104, 30105, and general maritime law. "The `saving to suitors' clause gives plaintiffs the right to sue on maritime actions in state court provided that the state court proceeds in personam . . . and not in rem." Endicott, 167 Wash.2d at 878-79, 224 P.3d 761 (citing Madruga v. Superior Court, 346 U.S. 556, 560-61, 74 S.Ct. 298, 98 L.Ed. 290 (1954)). "Such suits are governed by substantive federal maritime law." Endicott, 167 Wash.2d at 879, 224 P.3d 761 (citing Pope & Talbot, Inc. v. Hawn, 346 U.S. 406, 409-10, 74 S.Ct. 202, 98 L.Ed. 143 (1953)).
[7] Kasprik v. United States, 87 F.3d 462, 464 (11th Cir. 1996); Costa Crociere, S.p.A. v. Rose, 939 F.Supp. 1538, 1548 (S.D.Fla.1996).
[8] Johnson v. Cenac Towing, Inc., 468 F.Supp.2d 815, 832 (E.D.La.2006), vacated on other grounds, 544 F.3d 296 (5th Cir.2008).
[9] Sana v. Hawaiian Cruises, Ltd., 181 F.3d 1041, 1044 (9th Cir. 1999) (vessel owner's obligation to furnish maintenance and cure "does not depend on the negligence or fault of the shipowner, nor is it limited to cases in which the seaman's employment caused his illness").
[10] Vaughan v. Atkinson, 369 U.S. 527, 531, 82 S.Ct. 997, 8 L.Ed.2d 88 (1962); Barnes v. Andover Co., 900 F.2d 630, 633-34 (3rd Cir. 1990); see also 1 THOMAS J. SCHOENBAUM, ADMIRALTY AND MARITIME LAW, § 6-28, at 376-77 (4th ed.2004).
[11] Pelotto v. L & N Towing Co., 604 F.2d 396, 400 (5th Cir. 1979) (citations omitted).
[12] Gaspard v. Taylor Diving & Salvage Co., 649 F.2d 372, 374 n. 3 (5th Cir. 1981) (quoting Pelotto, 604 F.2d at 400).
[13] Costa Crociere, 939 F.Supp. at 1548.
[14] 369 U.S. 527, 532, 82 S.Ct. 997, 8 L.Ed.2d 88 (1962).
[15] See Johnson v. Marlin Drilling Co., 893 F.2d 77, 79-80 (5th Cir. 1990) (applying Vaughan to resolve conflicts in medical evidence in seaman's favor).
[16] See Vella v. Ford Motor Co., 421 U.S. 1, 5, 95 S.Ct. 1381, 43 L.Ed.2d 682 (1975) (maintenance and cure continues until incapacity is declared to be permanent); Tullos v. Res. Drilling, Inc., 750 F.2d 380, 388 (5th Cir.1985) ("`It is the [unequivocal] medical . . . determination of permanency that terminates the right to maintenance and cure.'" (quoting Hubbard v. Faros Fisheries, Inc., 626 F.2d 196, 202 (1st Cir.1980))).
[17] Brown v. Parker Drilling Offshore Corp., 410 F.3d 166, 177 (5th Cir.2005) (quoting Morales v. Garijak, Inc., 829 F.2d 1355, 1358 (5th Cir. 1987)).
[18] Morales, 829 F.2d at 1358.
[19] Morales, 829 F.2d at 1358.
[20] Legros v. Panther Servs. Grp., Inc., 863 F.2d 345, 352 (5th Cir. 1988); see also Atlantic Sounding Co. v. Townsend, ___ U.S. ___, 129 S.Ct. 2561, 2575, 174 L.Ed.2d 382 (2009); Kopczynski v. The Jacqueline, 742 F.2d 555, 559 (9th Cir. 1984).
[21] Defenses to maintenance and cure liability are few. Only "willful misbehavior," a "deliberate act of indiscretion," or an intentional misrepresentation of medical facts are sufficient to deprive a seaman of maintenance and cure protection. See Aguilar v. Standard Oil Co., 318 U.S. 724, 731, 63 S.Ct. 930, 87 L.Ed. 1107 (1943); McCorpen v. Cent. Gulf S.S. Corp., 396 F.2d 547, 548-49 (5th Cir. 1968); see also 1 SCHOENBAUM, § 6-31, at 384-86.
[22] According to respondent's brief, on January 30, 2008, ASC paid maintenance for the time period from May 18, 2007, to June 30, 2007, and January 1, 2008, to January 16, 2008.
[23] See Vaughan, 369 U.S. at 530-31, 533, 82 S.Ct. 997 (employer's default declared "callous," "willful and persistent" because employer conducted no investigation into seaman's claim).
[24] Morales, 829 F.2d at 1360.
[25] 963 F.Supp. 42, 44 (D.Mass.1997).
[26] Sullivan, 963 F.Supp. at 45 (emphasis added) (quoting Vella, 421 U.S. at 4, 95 S.Ct. 1381).
[27] 227 F.Supp.2d 1273, 1274 (M.D.Fla.2002)
[28] Bloom, 227 F.Supp.2d at 1275 (quoting United States v. Martin, No. 00-CV-303, 2001 WL 122224, at *2 (E.D.Pa. Feb. 8, 2001)).
[29] Bloom, 227 F.Supp.2d at 1275.
[30] 829 F.2d 1355 (5th Cir. 1987).
[31] No. 06-11347, 2008 WL 718138 (E.D.La. March 14, 2008).
[32] Morales, 829 F.2d at 1359.
[33] Morales, 829 F.2d at 1359-60.
[34] Estelle, 2008 WL 718138, at *2.
[35] Estelle, 2008 WL 718138, at *1.
[36] Vaughan, 369 U.S. at 531-32, 82 S.Ct. 997 (admiralty courts liberally construe the duty to pay maintenance and cure for the benefit of seamen (quoting Calmar S.S. Corp. v. Taylor, 303 U.S. 525, 529, 58 S.Ct. 651, 82 L.Ed. 993 (1938))).
[37] Aguilar, 318 U.S. at 730, 63 S.Ct. 930.
[38] Aguilar, 318 U.S. at 727, 63 S.Ct. 930.
[39] Vella, 421 U.S. at 4, 95 S.Ct. 1381.
[40] Farrell v. United States, 336 U.S. 511, 516, 69 S.Ct. 707, 93 L.Ed. 850 (1949).
[41] See Vella, 421 U.S. at 4, 95 S.Ct. 1381; Vaughan, 369 U.S. at 533, 82 S.Ct. 997.
[42] Mayhew v. Bell S.S. Co., 917 F.2d 961, 963 (6th Cir. 1990).
[43] Morales, 829 F.2d at 1358.
[44] Morales, 829 F.2d at 1360.
[45] 549 F.Supp. 71, 74 (E.D.La.1982).
[46] Parker, 549 F.Supp. at 76.
[47] Jauch v. Nautical Servs., Inc., 470 F.3d 207, 212 (5th Cir.2006).
[48] Harrison Mem'l Hosp. v. Gagnon, 110 Wash. App. 475, 485, 40 P.3d 1221 (2002).
[49] Harrison Mem'l Hosp., 110 Wash.App. at 485, 40 P.3d 1221.
[50] 1 SCHOENBAUM, § 6-28, at 380.
[51] 28 U.S.C. §§ 2201, 2202.
[52] Rowan Cos., Inc. v. Griffin, 876 F.2d 26, 28 (5th Cir. 1989).
[53] See RAP 18.1(b) (mandating that an attorney fee request be made in a separate section of the party's brief).
[54] Hudson v. Hapner, 170 Wash.2d 22, 30, 239 P.3d 579 (2010) (alteration in original) (quoting Wilson Court Ltd. P'ship v. Tony Maroni's, Inc., 134 Wash.2d 692, 701 n. 4, 952 P.2d 590 (1998)).