**Ida M. SMITH, Administratrix, Plaintiff, Appellant,**

v.

**REINAUER OIL TRANSPORT, Inc., Defendant, Appellee.**

**No. 5332.**

United States Court of Appeals First Circuit.

Heard May 6, 1958.

Decided June 24, 1958.

John O. Parker, Boston, Mass., with whom Ely, Bartlett & Brown, Boston, Mass., was on brief, for appellant.

Thomas H. Walsh, Boston, Mass., with whom Leo F. Glynn, Boston, Mass., was on brief for appellee.

Before MAGRUDER, Chief Judge, and WOODBURY and HARTIGAN, Circuit Judges.

MAGRUDER, Chief Judge.

This is a distressing case, in which the administratrix of a drowned seaman is suing for wrongful death under the Jones Act. 46 U.S.C.A. § 688. Nobody knows what exactly happened to him except that his dead body was fished out of the water several months after his disappearance, and that the proven circumstances warrant the inference that he fell into the water accidentally and was accidentally drowned. But as the Supreme Court has frequently reminded us, the Congress has not provided a workmen's compensation act for seamen; and so, when action is brought under the Jones Act, the plaintiff has the burden of proof that the injury or death of the seaman has been caused, in whole or in part, by negligence of the employer or or its officers, agents or employees. Nor does the plaintiff get to the jury merely by *claiming* that the seaman's death was caused by the employer's negligence, for it is incontrovertible, as we pointed out in New York, New Haven & Hartford R. Co. v. Dox, 1 Cir., 1957, 249 F.2d 572, 573, that

"plaintiff's right to a jury trial, as guaranteed by the Seventh Amendment to the Federal Constitution, is not an unqualified right to have the jury pass on issues of negligence and proximate cause in all cases. At the date of the adoption of the Seventh Amendment, and for centuries prior thereto, the *common law* had prescribed a function to be performed by the trial judge, as well as a function to be performed by the jury, in the determination of issues of negligence and of proximate causation. See Herron v. Southern Pacific Co., 1931, 283 U.S. 91, 51 S.Ct. 383, 75 L.Ed. 857. The jury was the body competent to decide all questions of credibility of witnesses, and all questions of fact fairly in dispute, together with inferences reasonably to be drawn therefrom. But the case might never reach the jury, because the trial judge had to

determine the preliminary issue whether the plaintiff had shown enough from which a fair-minded jury might legitimately return a plaintiff's verdict."

This preliminary judgment on the facts, which is entrusted to the trial judge, is often a delicate and difficult one to make. It is clearly not enough for the judge to determine whether he, individually, if he were sitting on the jury, would draw the inference of causal negligence. To a considerable extent the judge must be tolerant of differences of opinion, and he must recognize the possibility that, whatever might be his own view, other fair-minded men might reasonably arrive at a contrary conclusion. Often there are questions of degree, in which it is particularly hard for the judge, in exercising this preliminary judgment, to exclude altogether the personal equation. It is too easy to say that the jury must not be allowed to base a finding of causal negligence upon "speculation and conjecture", for as the Supreme Court said in Lavender v. Kurn, 1946, 327 U.S. 645, 653, 66 S.Ct. 740, 744, 90 L.Ed. 916: "Whenever facts are in dispute or the evidence is such that fair-minded men may draw different inferences, a measure of speculation and conjecture is required on the part of those whose duty it is to settle the dispute by choosing what seems to them to be the most reasonable inference."

No formal test that can be prescribed is so water-tight as to preclude the possibility of differences of opinion as to the correctness of the trial judge's preliminary judgment on the facts. In general terms, it can be said that a case should not be taken from the jury if, on the evidence presented, there is a rational basis for the inference that the defendant was probably in some respect negligent, and that the injuries complained of were caused, in whole or in part, by such negligence.

If an appellate court is of the view that the trial judge made an error of judgment in withdrawing a case from the jury, or in entering judgment for the defendant notwithstanding a plaintiff's verdict, a reversal is no doubt called for; but we cannot see that anything is gained by blowing up that error of judgment into a denial of the constitutional right to a jury trial as guaranteed by the Seventh Amendment. Such treatment makes the error sound worse than it really is.

We come now to the facts of the case before us.

The decedent, Fred Smith, joined the crew of the Harold Reinauer in Hancock, Maine, on December 2, 1953, as a utility man to do cleaning and painting in the engine room. Prior to that date Smith had been a member of the crew of various lobster smacks, and from November, 1952, he had served as an oiler aboard the motor vessel Bert Reinauer.

The Harold is a 237-ft. steel motor tanker of 218 gross tons. Her cargo is fuel oil, and her capacity is about 7,000 barrels. She is a coastwise tanker stopping primarily at smaller New England ports and Boston. Generally, members of the crew are kept on board while the vessel is in port in order to man the pumps necessary to take on and discharge cargo.

On Saturday morning, December 12, 1953, the Harold was tied up portside to her home pier in East Boston. The bow was pointing toward the harbor. She was made fast by four rope lines or hawsers, two spring lines and a forward and aft breast line. On the Harold's starboard side the R.T.C. 55 was made fast, and abreast of the R.T.C. 55 lay a small tug, the Andrew J. Ward. At a nearby pier some 75 feet way, the Lucy Reinauer, a vessel of similar size to the Harold, was secured.

The pier to which the vessels were moored is owned by the Boston Fuel Transportation, Inc., a corporation in identical ownership with the defendant corporation. A watchman was provided by Boston Fuel Transportation, Inc., to oversee the piers, the buildings on the premises, and smaller unattended vessels. There were two lights on top of the watchman's shack and a pole on the

corner of the dock containing a floodlight, which was some 75 feet from the stern and starboard side of the Harold and partially lighted its starboard side.

On this occasion, since there was no loading or discharging function to be accomplished, all the members of the crew, except Fred Smith, left the ship for the week-end about four o'clock in the afternoon. Smith stayed on board to serve as watchman and to tend the lines as necessitated by the rising and falling of the tide. According to the testimony of the chief engineer, called as a witness by the plaintiff, he had given instructions to Smith as to the operation of the light switches aboard the vessel and as to how to recharge the batteries which operated the lights. The chief engineer also testified that if all the lights of the ship were turned on, it would take eight or ten hours to run the batteries down.

The weather conditions on the night of December 12, 1953, were bad. It commenced to rain around five o'clock in the afternoon and continued well into Sunday.

The shore watchman, called as a witness by the plaintiff, testified that he saw Smith on the pier around seven o'clock in the evening on December 12 and that at that time he delivered to him two letters, upon receiving which Smith turned and headed in the general direction of his ship. So far as the evidence discloses, that was the last time anybody saw Smith alive. During the following March Smith's body was discovered and pulled out of the water at a point near where the stern of the Harold had rested during the previous December. The death certificate, issued by the Health Department of the City of Boston, certified that the cause of Smith's death was "Asphyxia due to drowning. Manner unknown. Presumably accidental Dec. 12, 1953". The clothing on the drowned man was what he was wearing when last seen by the watchman, minus only a cap. The watchman in addition testified that on the evening of December 12 he made four trips across the Harold on his way to inspect the smaller outlying vessels and found the available light on the Harold sufficient for his purposes.

At the close of the plaintiff's case, the defendant moved for a directed verdict. The defendant having elected to introduce no evidence, the trial judge submitted the case to the jury, reserving decision upon the motion for a directed verdict. The jury having returned a verdict for the plaintiff, the district court upon motion of defendant entered judgment notwithstanding the verdict, dismissing the complaint, from which judgment this appeal was taken by the plaintiff.

With no basis other than the fact that the vessel was an oil tanker, appellant suggests that Smith might have slipped on the deck and accidentally fallen overboard due to the presence of oil negligently allowed to remain on the deck. There was absolutely no evidence of this, and the jury's verdict could not be supported on that theory. See Adamowski v. Gulf Oil Corp., D.C.E.D.Pa.1950, 93 F.Supp. 115, affirmed 3 Cir., 1952, 197 F.2d 523.

A second suggested ground of causal negligence is that Smith might have slipped on the wet deck due to inadequate lighting on the deck during the time he was performing his duties of watchman and tending the lines. There was testimony by the shore watchman that the lights on the Harold were not lighted on the night of December 12, 1953. If the uncontradicted testimony of the chief engineer is to be believed, Smith had been instructed as to the location of the light switches and as to the manner in which the batteries could be recharged if necessary, so that the absence of a light on board the Harold could only have been due to the choice of Smith himself. Furthermore, even if this testimony of the chief engineer might be disbelieved by the jury as being the testimony of an interested witness, it is still incredible that a seaman of Smith's experience would not have been aware of the presence of the ship's light switches. Although Smith was last seen alive on the dock rather than on the deck, it may be that the plain-

tiff is entitled to the benefit of a presumption that the injury occurred while the employee was at his proper station performing his assigned task. See Tennant v. Peoria & P. U. Ry. Co., 1944, 321 U.S. 29, 34, 64 S.Ct. 409, 88 L.Ed. 520. Yet, it seems to us, the evidence presented would not warrant a rational inference that, more likely than not, Smith slipped and accidentally fell overboard due to negligence of the defendant in not supplying adequate lighting. We regard Schulz v. Pennsylvania R. Co., 1956, 350 U.S. 523, 76 S.Ct. 608, 100 L.Ed. 668, as plainly distinguishable on its facts.

Perhaps the major contention of appellant in support of the jury's verdict is that, even if no negligence of the defendant contributed to causing Smith to fall overboard, nevertheless the jury might well have found the defendant negligent in the performance of its affirmative duty to use care to rescue a seaman who had fallen overboard from whatever cause. Undoubtedly there is such an affirmative duty, as the cases have all held. Harris v. Pennsylvania R. Co., 4 Cir., 1931, 50 F.2d 866; Kirincich v. Standard Dredging Co., 3 Cir., 1940, 112 F.2d 163; Sadler v. Pennsylvania R. Co., 4 Cir., 1947, 159 F.2d 784. As this last case pointed out, the performance of this affirmative duty of care may require the shipowner to make advance provision of lifesaving equipment, suitably placed aboard the ship; from which appellant argues that, if there is such a duty, a fortiori there must be a duty to make advance provision to have somebody on board available to utilize this lifesaving equipment, instead of which, in the case at bar, Smith was left on board alone. But it seems to us as a matter of law that the absence of an additional member of the crew on board, while the vessel was tied up at its home pier inactive during a week-end, with a shore watchman being present on the pier charged with the occasional duty of boarding and inspecting the other ships, cannot be considered negligence on the defendant's part. Furthermore, there is an entire absence of evidence indicating that if an additional

crew member had been left on board it would have done any good. Cf. Ford v. Trident Fisheries Co., 1919, 232 Mass. 400, 122 N.E. 389. Had Smith yelled for help after falling overboard, as to which there was no evidence, there were crew members of the Lucy Reinauer only 75 feet away who presumably could and would have given help. We agree with the trial judge that the jury's verdict cannot be supported on the basis of an inference of causal negligence in the performance of the duty to rescue.

Finally, appellant asserts that if she is wrong on the foregoing points, still she is entitled to a reversal for a new trial on the ground that it was error for the trial judge, in charging the jury, to disregard the provisions of the Seamen's Act, 38 Stat. 1164 (1915), as amended. The specific contentions are that it is evidence of negligence that appellee permitted Smith to work for a longer period than eight hours, and also that it permitted Smith, a member of the engine room crew, to work on deck. The statutory provisions, as they now appear in 46 U.S.C.A. § 673, are as follows:

"§ 673. Requirements as to watches; duties of seamen; hours of work; penalty; right of seamen to discharge; effective date.

"In all merchant vessels of the United States of more than one hundred tons gross, excepting those navigating rivers, harbors, lakes (other than Great Lakes), bays, sounds, bayous, and canals, exclusively, the licensed officers and sailors, coal passers, firemen, oilers, and water tenders shall, while at sea, be divided into at least three watches, which shall be kept on duty successively for the performance of ordinary work incident to the sailing and management of the vessel: *Provided*, That in the case of radio-telegraph operators this requirement shall be applicable only when three or more radio officers are employed. No licensed officer or seaman in the deck or engine department of any tug documented under the laws of

the United States (except boats or vessels used exclusively for fishing purposes) navigating the Great Lakes, harbors of the Great Lakes, and connecting and tributary waters between Gary, Indiana; Duluth, Minnesota; Niagara Falls, New York; and Ogdensburg, New York, shall be *required or permitted* to work more than eight hours in one day except in case of extraordinary emergency affecting the safety of the vessel and/or life or property. The seamen shall not be shipped to work alternatively in the fireroom and on deck, nor shall those shipped for deck duty be *required* to work in the fireroom, or vice versa; nor shall any licensed officer or seaman in the deck or engine department be *required* to work more than eight hours in one day; but these provisions shall not limit either the authority of the master or other officer or the obedience of the seamen when in the judgment of the master or other officer the whole or any part of the crew are needed for maneuvering, shifting berth, mooring, or unmooring, the vessel or the performance of work necessary for the safety of the vessel, her passengers, crew, and cargo, or for the saving of life aboard other vessels in jeopardy, or when in port or at sea, from requiring the whole or any part of the crew to participate in the performance of fire, lifeboat, or other drills. \* \* \*" (Italics added.)

There was no evidence of a violation of these provisions of the statute. It appears that where the statute requires that a crew member not be permitted to do an act, it uses the term "required or permitted". On the other hand, where the statute merely attempts to prevent a crew member from being required to do an act but does not prevent him from consenting to do the act, the language so indicates. The section in no way prohibits a seaman from agreeing to work more than eight hours in a row. See The Youngstown, 5 Cir., 1940, 110 F.2d 968; Kane v. American Tankers Corp. of Delaware, 2 Cir., 1955, 219 F.2d 637. Nor does the Act make it mandatory that an engine room crew member not be permitted to work on deck. See Kane v. American Tankers Corp. of Delaware, supra. See also O'Hara v. Luckenbach S. S. Co., 1926, 269 U.S. 364, 46 S.Ct. 157, 70 L.Ed. 313. In addition, it is to be noted that the statute allows the captain considerable leeway when he feels it necessary to provide men for the protection of the ship in varying situations; and certainly it can be considered necessary to provide a watchman on board while the ship is in harbor, and it would not be an abuse of discretion for the captain to use one of his own crew members rather than to bring in a stranger from shore who may not have been working for the previous eight hours.

Of course it might be suggested that, irrespective of the Act, it was negligence to permit a seaman to be on duty continuously over the week-end. However, in view of the almost nominal nature of decedent's duties, this suggestion would not seem to be well taken. Also, there is no reasonable basis for an inference that Smith fell overboard because he was dog-tired from overwork.

A judgment will be entered affirming the judgment of the District Court.