IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | |
|---|---|
| THOMAS EDWARD PEAK,<br><br>               Appellant,<br><br>v.<br><br>WASHINGTON STATE<br>DEPARTMENT OF<br>TRANSPORTATION,<br><br>               Respondent. | No. 85610-3-I<br><br>ORDER DENYING MOTION<br>FOR RECONSIDERATION,<br>WITHDRAWING OPINION,<br>AND SUBSTITUTING<br>OPINION |

The Respondent, Washington State Department of Transportation, has moved for reconsideration of the unpublished opinion filed on July 29, 2024. The panel has considered the motion and has determined that the motion should be denied, the opinion should be withdrawn, and a substitute opinion be filed.

Now, therefore, it is hereby

ORDERED that the respondent's motion for reconsideration is denied; and it is further

ORDERED that the unpublished opinion filed on July 29, 2024, is withdrawn; and it is further

ORDERED that a substitute unpublished opinion be filed.

Coburn, J.

Birk, J.

Hazelrigg, ACJ

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

THOMAS EDWARD PEAK,

      Appellant,

    v.

WASHINGTON STATE DEPARTMENT
OF TRANSPORTATION,

      Respondent.

No. 85610-3-I

DIVISION ONE

UNPUBLISHED OPINION

COBURN, J. — Thomas Peak, a seaman for the ferries division of the Washington State Department of Transportation (WSDOT), fell down a ship's stairs[1] and sustained an injury to his back. Peak brought claims of unseaworthiness and negligence under the Jones Act, 46 U.S.C. § 30104, alleging that an unsecured mat on the landing at the top of the stairs caused him to slip. He also claims that he is owed reinstatement of maintenance and cure, which WSDOT had paid until Peak's physician determined that he had reached maximum medical improvement. The trial court granted WSDOT's summary judgment motion and dismissed all of his claims. Because genuine issues of material facts exist as to the unseaworthiness and negligence claims, we reverse the dismissal of those claims. However, because the record establishes that Peak reached

---

[1] The terms "stairs," "ladder," "stairway," and "ladderway" are used interchangeably throughout the record. In all instances, they describe the same "stairway" that is at issue in this case.

maximum medical improvement, we affirm the dismissal of his claim for maintenance and cure.

## FACTS

Peak was an oiler working the night shift on the Washington State ferry M/V TILLIKUM while it was docked on October 1, 2019. He was performing fueling tasks along with fellow oiler Dan Delaney and relief chief Michael Fleetwood. Prior to the fueling process, the three met with the fuel truck driver to perform a pre-fueling safety meeting. The procedure varies from ship to ship, but on the M/V TILLIKUM that night the pre-fueling meeting was to occur on the car deck above the Engineering Operating Station (EOS). Peak testified that Fleetwood came up the port stairwell from the EOS like "his tail was on fire" because Fleetwood had slipped at the landing after coming up the stairs. Peak did not remember what Fleetwood slipped on, but testified "I was outside of the doorway and saw his head almost come near the door as he was coming out."

Fleetwood testified that as he "was going up to sign the paperwork for the [fuel] truck driver . . . I open the door, and I hit my knee on – going over that door sill.[2] And I made a big deal about it just so that – to make the oilers and the truck driver aware that I had slipped on that stupid mat." Fleetwood further described that same incident by saying "[a]s I'm lifting over [the door coaming], the mat slipped, I lost purchase, and I hit my knee on it and kind of grabbed the frame and carried on out the door."

---

[2] The "door sill" Fleetwood describes is identified in other testimony as a "coaming," a raised vertical section around hatch openings on a ship designed to deflect and prevent entry of water.

Fleetwood testified that he believed the specific mat used at the top of the stairwell landing was the type of mat that was formerly in front of electrical devices in the control room, but had to be replaced fleet-wide because the Coast Guard said they were not the proper mat to have in that location. Fleetwood explained, "So these mats – we had a bunch of these mats left over because we had to change them out. So this mat, at one time, was probably in the control room, and it got moved up to that upper landing." Delaney described the mat as one that was placed there by the staff chief.[3]

Later in the evening of October 1, after Fleetwood had slipped, Delaney and Peak left the car deck through the same port that Fleetwood used earlier and headed to the EOS. Delaney descended first without issue. Peak followed.[4] He stepped over the coaming and put his right hand on the railing to take another step down the stairs when "the next thing I know I was heading down the ladder . . . trying to arrest myself with my hand."

Delaney was still descending near the bottom of the stairs when he heard Peak above him. Delaney heard a noise and got out of the way as quickly as he could before Peak slid down the stairs on his back, falling at the bottom. Delaney testified that after Peak fell, "I could see that the – the mat that, prior to this, was up against the – the coaming – I could see that the mat was further out on the top platform. So I could see that the mat had moved. But I did not see him slide – initially slide on the mat." He

---

[3] Delaney also testified that the treads on the stairs did not have a proper non-tread surface, that he and others had slipped on the stairs, and that attempts to improve it made them more slippery instead. Peak's complaint and the summary judgment motion focused only on the allegation that the mat at the top landing caused Peak to slip.

[4] Peak testified that he believed Delaney was already downstairs when Peak attempted to descend from the landing. But Delaney testified that he was going down the stairs just ahead of Peak at the time.

added that he could see "that the mat was away from that coaming and partially on – on that platform lip where you saw the paint was kind of scuffed away, on that steel . . . it was partially on that edge."

At the time of the fall, Fleetwood was in the control room[5] near the bottom of the stairs when he heard a noise which he later stated was "Tom Peak falling down the stairs." The doorway between the control room and the bottom landing of the port stairwell was closed at that time. Fleetwood rushed out of the room and, with Delaney, helped Peak onto a chair. Peak was complaining about radiating lower back pain, and the other two men gave him ice packs for his back.

The accident occurred around 11:50 p.m. Peak and Fleetwood digitally signed their respective on-the-job injury reports dated the next day. Peak's employee report described the incident as "[w]hile descending port ladder from car deck to EOS, Oiler Peak slipped on mat on upper landing (mat slides on smooth steel deck) and slid down stairs on his back." Fleetwood's supervisor report described the incident as "Tom was on upper landing slipped on rubber mat slid down the stairs fast on his back landed with crash on the lower deck outside EOS I heard him falling and went to give first aid. 2350 was the time." Both men signed their respective reports under penalty of perjury.

Peak sued WSDOT in October 2020. Peak asserted two causes of action: negligence under the Jones Act,[6] and that the M/V TILLIKUM was unseaworthy at the

---

[5] Fleetwood uses the term EOS and "control room" interchangeably.
[6] The Jones Act, 46 U.S.C. § 30104, provides a federal cause of action for injured seamen. The Jones Act provides in pertinent part:
A seaman injured in the course of employment . . . may elect to bring a civil action at law, with the right of trial by jury, against the employer. Laws of the United States regulating recovery for personal injury to, or death of, a railway employee apply to an action under this section.

time of his injury. Among the claimed damages, Peak listed "[m]aintenance and cure according to proof." In April 2021, Dr. Richard Seroussi, who evaluated Peak, declared Peak at "maximum medical improvement given that he has gone through an array of reasonable and necessary treatments, without any significant further improvement." Based on Seroussi's report and the depositions of Peak, Delaney and Fleetwood, WSDOT moved for summary judgment of all claims.

Delaney and Fleetwood testified that they did not actually see what happened when Peak was on the stair's top landing. In Peak's deposition, taken in March of 2023, he had trouble recalling what exactly happened when he stepped onto the landing to go down the stairs. He said that before he "went from doing a normal movement to flying downstairs," he could remember specific details about the stairs, including a sprinkler manifold across from the lower port stair landing that is visible on the descent, the rag in his gloved left hand while he gripped a railing with his right, and his thoughts about checking gauges on the deck he was descending to. But Peak could "not specifically" recall what prompted him to start sliding down the stairs. When asked if he noticed the mat slipping prior to his injury, Peak said he did not or he would have corrected it.

Peak submitted, in support of his opposition to the motion, declarations from himself, Fleetwood, his vocational rehabilitation counselor Neil Bennett, and an expert witness on ship safety, Russell Johnson. Peak's declaration stated

> About two hours after I was injured on the M/V TILLIKUM on October 1,
> 2019, I reported, with the relief Chief Michael Fleetwood, that when

---

The reference to statutes modifying or extending the common-law right or remedy in cases of injury to railway employees incorporates the Federal Employers' Liability Act (FELA), 45 U.S.C. § 51, which provides for liability for injury "resulting in whole or in part from the negligence of (the employer)."

descending the port ladder from the car deck to the Engineer Operating Station (EOS) I slipped on the mat on the upper landing because the mat slid on the smooth, steel deck. This caused me to slide down the stairs of the ladder on my back, permanently injuring my back.

. . .

I have no doubt that what I reported to the Washington State Ferries under the penalty of perjury about two hours after I was injured was an accurate description of how I was injured.

Fleetwood's declaration stated that he "was a witness to a fall that Thomas Peak sustained" and reiterated his belief that "[h]is accident occurred when Thomas Peak slipped on a mat that was on the upper landing." Fleetwood's declaration also stated that "I am aware that the mat was inadequately secured because of my personal knowledge of the condition of the mat and its propensity to slide . . [e]arlier that shift, when I was stepping out from the portside upper landing from the landing to the deck, the mat slid out from under me and I sustained a slight unreported injury." Johnson's declaration summarized the "appropriate standards for upkeep and maintenance of the vessel" and applied those standards to describe the extent to which M/V TILLIKUM met them, but Johnson also stated as a conclusion from his review of the record that Peak had slipped on the mat.

WSDOT moved to strike all three declarations on the basis that Peak's declaration lacked a signature,[7] that their declarations contradicted Peak's and Fleetwood's prior deposition testimony, and that Johnson and Fleetwood had no basis of personal knowledge to conclude that the mat caused Peak's fall.

The trial court struck Peak's declaration on the basis of inadmissibility and to the extent that it "does not explain the basis for the discrepancy between his unequivocal

---

[7] Peak's declaration was filed on May 1 without a signature. His declaration was re-filed on May 9 with a signature.

deposition testimony and the incident report form that he signed." The court also struck portions of Fleetwood and Johnson's declarations to the extent they state a belief that Peak slipped on the mat on the landing when neither had personal knowledge as to that fact. The trial court granted WSDOT's motion and dismissed all of Peak's claims.

Peak appeals.

DISCUSSION

Standard of Review

We review trial court rulings on summary judgment de novo. <u>Dean v. Fishing Co. of Alaska, Inc.</u>, 177 Wn.2d 399, 405, 300 P.3d 815 (2013). Summary judgment is proper if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c); <u>Dean</u>, 177 Wn.2d at 405. The burden is on the party moving for summary judgment to demonstrate there is no genuine dispute as to any material fact, and reasonable inferences from the evidence must be resolved against the moving party. <u>Lamon v. McDonnell Douglas Corp.</u>, 91 Wn.2d 345, 349, 588 P.2d 1346 (1979) (citing <u>Morris v. McNicol</u>, 83 Wn.2d 491, 494-95, 519 P.2d 7 (1974)). Summary judgment is then appropriate if the plaintiff, as nonmoving party, "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." <u>Young v. Key Pharmaceuticals, Inc.</u>, 112 Wn.2d 216, 225, 770 P.2d 182 (1989).

The de novo standard of review applies to all trial court evidentiary rulings on admissibility made in conjunction with a summary judgment motion. <u>Keck v. Collins</u>, 184 Wn.2d 358, 368, 357 P.3d 1080 (2015) (citing <u>Folsom</u>, 135 Wn.2d at 662-633)).[8]

---

[8] However, when trial courts exclude evidence because it was untimely disclosed, it must consider the factors from <u>Burnet v. Spokane Ambulance</u>, 131 Wn.2d 484, 933 P.2d 1036

7

<u>Causation</u>

Peak's complaint alleges that "he attempted to descend the port ladder from the car deck to EOS and slipped on a mat that was on the upper landing, forcing him to slide down the stairway and land on his back." WSDOT moved for summary judgment identifying one issue in its motion: "Is Defendant entitled to a dismissal with prejudice of all of Plaintiff's claims in his *Complaint* against Defendant because Plaintiff has no record evidence as to what caused his fall on October 1, 2019?" During the summary judgment hearing, the trial court asked counsel for WSDOT if there is a distinction with regard to the applicable facts or law between the Jones Act claim and the unseaworthiness claim. Counsel responded that while the claims have different legal standards, "they both have causation elements and those are what really are key here today. The distinction between the liability standards and the Jones Act and the unseaworthiness are not heavily in play here." After WSDOT presented argument, the court turned to Peak's counsel and said, "it seems to me that causation is the crux here, right? As I understand defendant's motion, it's really limited to the elements of causation." Peak's counsel agreed and WSDOT did not otherwise direct the court that the motion was focused on anything other than causation.[9]

(1997). <u>Keck</u>, 184 Wn.2d at 368-69. In response to the motion for summary judgment, Peak first submitted his unsigned declaration. WSDOT moved to strike Peak's declaration because it was unsigned. The next day, Peak filed a signed version with a surreply. He argued that the trial court should not strike untimely evidence without conducting a <u>Burnet</u> analysis. The trial court did not strike Peak's declaration because it was untimely. WSDOT does not argue on appeal that this court should affirm the court's striking of Peak's declaration on the basis of untimeliness.

[9] "The elements of a Jones Act negligence claim are: duty, breach, notice, and causation." <u>Ribitzki v. Canmar Reading & Bates, Ltd. P'ship</u>, 111 F.3d 658, 662 (9th Cir. 1997). A claim of unseaworthiness requires that a plaintiff prove: (1) the warranty of seaworthiness extended to the seaman and their duties; (2) their injury was caused by a piece of the ship's equipment or an appurtenant appliance; (3) the equipment used was not reasonably fit for its

Peak contends that the trial court improperly dismissed his claims as a matter of law.

Causation is generally a question of fact for the jury, unless "the proof is insufficient to raise a reasonable inference that the act complained of was the proximate cause of the injury." Leaf v. United States, 588 F.2d 733, 736 (9th Cir. 1978), abrogated on other grounds by Sosa v. Alvarez-Machain, 542 U.S. 692, 124 S. Ct. 2739, 159 L. Ed. 2d 718 (2004). Proximate causation has two elements: legal cause and cause-in-fact. Hartley v. State, 103 Wn.2d 768, 777, 698 P.2d 77 (1985). Cause in fact (also known as "but for" causation) refers to the "physical connection between an act and an injury." Hartley, 103 Wn.2d at 778. The plaintiff must "establish that the harm suffered would not have occurred but for an act or omission of the defendant." Joyce v. Dep't of Corrections, 155 Wn.2d 306, 322, 119 P.3d 825 (2005). On summary judgment, a court may determine a question of fact only if reasonable minds could reach but one conclusion from the evidence. Ruff v. County of King, 125 Wn.2d 697, 703, 887 P.2d 886 (1995). "Cause in fact is usually a question for the trier of fact and is generally not susceptible to summary judgment." Martini v. Post, 178 Wn. App. 153, 164, 313 P.3d 473 (2013) (citing Owen v. Burlington N. Santa Fe R.R. Co., 153 Wn.2d 780, 788, 108 P.3d 1220 (2005)).

A. *Jones Act*

"The quantum of evidence necessary to support a finding of Jones Act negligence is less than that required for common law negligence . . . and even the slightest negligence is sufficient to sustain a finding of liability." Havens v. F/T Polar

---

intended usage; and (4) the unseaworthy condition proximately caused the injuries. Id. at 664 (citing Gebhard v. S.S. Hawaiian Legislator, 425 F.2d 1303, 1310-12 (9th Cir. 1970)).

Mist, 996 F.2d 215, 218 (9th Cir.1993).  As explained by the United States Supreme Court, under the Jones Act "the test . . . is simply whether the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought."  Ferguson v. Moore-McCormack Lines Inc., 352 U.S. 521, 523, 77 S. Ct. 457, 1 L. Ed. 2d 511 (1957) (quoting Rogers v. Missouri Pac. R. Co., 352 U.S. 500, 506, 77 S. Ct. 443, 1 L. Ed. 2d 493 (1957)).  Courts must therefore exercise special care in considering summary judgment to resolve cases under the Jones Act, which requires "a very low evidentiary threshold for submission to a jury."  Lies v. Farrell Lines, Inc., 641 F.2d 765, 770 (9th Cir. 1981) (citing Leonard v. Exxon Corp., 581 F.2d 522, 524 (5th Cir. 1978)).

WSDOT argues that Peak has provided no evidence regarding causation.  Relying on Peak's deposition, WSDOT argues that "he does not know what caused him to fall down the stairway and specifically admitted he does not remember the mat slipping out from under him."  WSDOT further argues that there "were no eyewitnesses to Peak's fall.  His two co-workers speculated that he slipped on the mat."  WSDOT concludes that "[t]he only reasonable inference from Delaney's and Peak's testimony is that Peak's body moved the mat in some way as he was falling from a misstep."

WSDOT appears to suggest that the only way Peak can prove causation is if he personally testifies at trial that he remembers that his slip was caused by the mat or if there was an eyewitness to the mat causing Peak's accident.  WSDOT relies on Hawley v. Alaska S.S. Co., 236 F.2d 307 (9th Cir. 1956), Caldwell v. Manhattan Tankers Corp., 618 F.2d 361 (5th Cir. 1980), and Smith v. Reinauer Oil Transp., Inc., 256 F.2d 646 (1st

Cir. 1958) to support its contention that Jones Act claims like Peak's should be dealt with on summary judgment dismissal standard. All are distinguishable.

In Hawley, a seaman was injured while assisting the loading of cases of canned salmon into a ship's hold on a pallet board operated by a winch. 236 F.2d at 308. At the close of plaintiff's case, the trial court granted defendant's motion for a judgment of dismissal for insufficiency of the evidence to prove negligence under the Jones Act. Id. The seaman claimed that the place of work was unsafe because it was a severely confined space. Id. at 310. But he failed to show that the manner of loading the hold was not the usual and customary one, and at the time of impact, the seaman could have avoided the contact that caused the injury by a short backward movement in the space behind him. Id. The seaman also contended that negligence was shown by placing inexperienced cannery employees in the same crew with him, but on cross-examination the seaman admitted that he was inexperienced and would not be able to say whether others were capable cargo handlers or not. Id. at 310-11. The Ninth Circuit affirmed the dismissal agreeing that the evidence was insufficient to take the case to the jury. Id. at 311.

In Caldwell, a seaman slipped and caught his foot on one of the gangplank runners while descending on the gangplank. 618 F.2d at 362. Fearing that he would fall between the ship and the dock, he threw himself from the gangplank to the dock, a distance of ten to eleven feet. Id. The impact upon the dock caused injury to the worker's leg. Id. The only evidence presented at trial was his own testimony, he never saw any grease on the gangplank, his clothes or his shoes, and though he testified that the gangplank area was not lit he was able to see where he was going. Id. No one

witnessed the accident. Id. The Fifth Circuit upheld the directed verdict in favor of defendant after plaintiff rested. Id. The appellate court held that the seaman's evidence "does not reasonably or even marginally intimate that the [defendant] was negligent or that the ship was unseaworthy." Id. at 363.

Smith was a wrongful death action under the Jones Act. 256 F.2d at 648. "Nobody knows what exactly happened to [Smith] except that his dead body was fished out of the water several months after his disappearance, and that the proven circumstances warrant the inference that he fell into the water accidentally and was accidentally drowned." Id. The First Circuit upheld a judgment notwithstanding the verdict in favor of the defendant. Id. at 650. The court reasoned, "[w]ith no basis other than the fact that the vessel was an oil tanker, appellant suggests that Smith might have slipped on the deck and accidentally fallen overboard due to the presence of oil negligently allowed to remain on the deck. There was absolutely no evidence of this, and the jury's verdict could not be supported on that theory." Id. 650.

Unlike the plaintiffs in Hawley, Caldwell and Smith, Peak *does* present evidence that connects his injury with what could be viewed as negligence of the shipowner. Even if Peak is not able to remember at trial if he slipped on the mat, his testimony does not contradict his claim that the mat contributed to his fall. A party may prove its case through circumstantial evidence. E.g. State v. Taylor, 47 Wn.2d 213, 216, 287 P.2d 298 (1955) ("Verdicts in either civil or criminal cases may be based entirely upon circumstantial evidence."); Boguch v. Landover Corp., 153 Wn. App. 595, 610-11, 224 P.3d 795 (2009) (A plaintiff may prove the elements of negligence through circumstantial evidence, but the facts must be so related as to show the theory of

negligence is the only conclusion that fairly or reasonably can be drawn from them.).  A jury is not limited in its findings to the direct testimony of any one witness, but rather is "free to accept, or reject, any part of the testimony of any witness."  Moen v. Chestnut, 9 Wn.2d 93, 102, 113 P.2d 1030 (1941).

Both Fleetwood and Delaney testified that a mat was on the landing above the stairs on October 1, 2019.  In an admitted portion of Fleetwood's declaration, he states "I am aware that the mat was inadequately secured because of my personal knowledge of the condition of the mat and its propensity to slide when stepped on if the mat is on a smooth metal surface."  Fleetwood further declared "[e]arlier that shift, when I was stepping out from the portside upper landing from the landing to the deck, the mat slid out from under me and I sustained a slight unreported injury."  Delaney's deposition testimony states his belief that the mat had "a very slick bottom to it" which "on a painted steel surface . . . made it actually more dangerous for people to slip."  Delaney also described how, while he was descending from the port landing down the stairwell, he heard a noise above him and narrowly managed to step out of the way on the lower ladder well, having turned in time to see Peak "coming down the ladder on his back."  After Peak's fall Delaney observed that the mat which he had personally descended past "that, prior to this, was up against the – the coaming – I could see that the mat was further out on the top platform.  So I could see that the mat had moved."  The admitted portions of expert Johnson's declaration state that the type of mat identified by Delaney as the mat that was on the upper landing "was not fit for its intended purpose and should not have been used on the landing."  Johnson further noted that photographs taken of the leading edges of the landing (without the mat) "appears worn, smooth, and

13

damaged," that "due to time constraints" nonskid was not applied to the landing despite complaints by the crew, and that "[a] cursory inspection of the vessel would and should have caused these hazards and defects to be remedied prior to [Peak]'s injury."

The standard to determine a question of fact on summary judgement requires that there be "but one" reasonable conclusion from the evidence, which must be at odds with the causation alleged in the complaint. Hartley, 103 Wn.2d at 778. While WSDOT insists that the only plausible theory of the fall is that Peak mis-stepped and his body falling shifted the mat on his descent, Peak has presented evidence to support his theory that the unsecured mat contributed to his fall. There is no one conclusion that a reasonable mind could reach from the evidence. Ruff, 125 Wn.2d at 703. The question of causation therefore must be left for the jury.

*B. Unseaworthiness*

> A seaworthy ship is one that is reasonably fit for its intended use. *Mitchell v. Trawler Racer, Inc.*, 362 U.S. 539, 550 (1960). Unseaworthiness is a form of strict liability, in that the plaintiff does not have to show fault. *Miller v. Arctic Alaska Fisheries Corp.*, 133 Wn.2d 250, 264-65 n.7, 944 P.2d 1005 (1997). To establish a claim for unseaworthiness, a plaintiff must show that she (1) "was injured while in the ship's service, (2) by a piece of ship's equipment, (3) which was not reasonably fit for its intended use." 133 Wn.2d at 264. The doctrine of unseaworthiness is broad and extends to almost any defective condition related to the ship, however temporary that defective condition may be. *Usner v. Luckenbach Overseas Corp.*, 400 U.S. 494, 499 (1971). Unseaworthy conditions can arise from a wide variety of circumstances. *Usner*, 400 U.S. at 499 (1971). The duty extends to appliances "appurtenant" to the ship. *Bishop v. Alaska S.S. Co.*, 66 Wn.2d 704, 709-10, 404 P.2d 990 (1965). A ship is unseaworthy if it is insufficiently or defectively equipped. *Waldron v. Moore-McCormack Lines, Inc.*, 386 U.S. 724, 726 (1967).

Stinson v. State, No. 44004-1-II, slip op. 14-15 (Wash. Ct. App. Jan. 28, 2014) (unpublished), https://www.courts.wa.gov/opinions/pdf/D2%2044004-1-II%20%20Unpublished%20Opinion.pdf.[10]

> Causation is more difficult to establish for unseaworthiness than for the Jones Act. To establish causation in the case of unseaworthiness, a plaintiff must demonstrate not only that the seaman was in service of the ship, but also that a piece of the ship or the ship's condition played a substantial part in causing the plaintiff's injuries.

Id. at 15 (citing Faraola v. O'Neill, 576 F.2d 1364, 1366 (9th Cir. 1978). Nonetheless, summary judgment is inappropriate when, taking the facts in the light most favorable to Peak, a reasonable jury could find that the type of mat identified by Delaney as the mat that was on the upper landing "was not fit for its intended purpose and should not have been used on the landing."

WSDOT argues that this court may not consider expert Johnson's opinion because it relied on Delaney's testimony and photographs of the mat and Delaney could not recall if the mat in the photographs was the same mat at the top of the landing when Peak fell. First, as stated above, the only portion of Johnson's declaration that was struck by the trial court was his opinion as to causation. The court did not strike Johnson's opinion offered with regards to the appropriate standards for upkeep and maintenance of the vessel. Johnson based his testimony on the testimony and photographs from Delaney, which included a photograph of a 3-by-4 foot Aramark mat identified as Exhibit 2 to Delaney's deposition. Johnson observed that

> Fleetwood, identified that the mat Peak slipped on was one of the mats that were used by Washington State Ferries (WSF) in that late 1990s early

---

[10] We cite this unpublished opinion under GR 14.1(c), which provides that we may cite or discuss unpublished opinions in our opinions if "necessary for a reasoned decision." It is offered to demonstrate Washington court's reliance on federal cases in summary judgment motions of unseaworthiness claims.

2000s in the engine rooms of the vessels. Fleetwood testified that the Coast Guard communicated to WSF the mats could not be used in electrical spaces, so they were utilized in other spaces on the vessels. This would make the age of the mat Peak slipped on approximately 20-25 years old. The Aramark mat was not fit for its intended purpose and should not have been used on the landing.

. . .

The surface landing at the time the incident occurred (or shortly thereafter) taken by Delaney appears smooth, worn, and rusted in areas. This is consistent with the deposition testimony of Fleetwood and the injury report he submitted for Peak's October 1, 2019 injury ("While descending port ladder from car deck to EOS, Oiler Peak slipped on mat on upper landing (mat slides on smooth steel deck)"

. . .

There appears to be an outline of the location where the mat was placed on the landing and where it has worn over time.

. . .

Oiler Delaney communicated to Chief Peter Miele that the landing was slick, and he asked for nonskid to be applied. Chief Miele provided this mat on the landing after port engineers communicated, they could not apply nonskid due to time constraints. Oiler Delaney testified the black mat had a "very slick bottom to it" and that "on a painted steel surface . . . . made it actually more dangerous for people to slip."

During a deposition, Delaney was asked about Exhibit 2. WSDOT's counsel submitted photographs taken in May 2023 of the subject landing showing its measurement to be 42 inches wide and 34 inches deep. Delaney testified that he did take a picture of the actual mat at the top of the ladder a couple of days after Peak's injury. Delaney said Exhibit 2 "looked very similar to the one that was at the top" and that it "looks exactly like the mat." Delaney testified that he could not say "if [Exhibit 2 depicts] the exact same mat," but that "[t]he bottom of it looks exactly like the one that was at the top of the ladder."

As discussed above, Peak, in his deposition taken more than three years after the fall, could not specifically say what caused him to start sliding and did not notice the mat slip *prior* to his injury. Notably, Peak did not testify that he fell because he simply

16

stepped off the landing. Peak said the incident "was very quick, 'I've got something under my feet and I don't have anything under my feet.'" As discussed above, Fleetwood testified that he had personal knowledge that the mat was not secure because earlier in the shift, he, himself, had slid on the mat and sustained a slight unreported injury. And Delaney testified the mat was up against the coaming before he ascended, but saw the mat was away from the coaming and partially on the platform lip after Peak fell.

Taking the facts in light most favorable to Peak, a reasonable jury could determine that the unsecured mat that was at the top of the landing when Peak fell was not fit for its intended purpose and constituted a substantial factor in Peak's injury as he worked as a seaman on the M/V TILLIKUM. Thus, summary judgment was inappropriate on his unseaworthiness claim.

Breach and Notice

WSDOT also argues, for the first time on appeal, that "Peak cannot point to any evidence on the record to create a genuine issue of material fact as to breach, notice or causation – all crucial elements of his negligence claim." But its summary judgment motion identified the single issue of causation and argument during the summary judgment hearing was consistent with that motion. We decline to entertain any additional arguments that were not raised in WSDOT's motion for summary judgment. "On review of an order granting or denying a motion for summary judgment the appellate court will consider only evidence and issues called to the attention of the trial court." Johnson v. Lake Cushman Maint. Co., 5 Wn. App. 2d 765, 780, 425 P.3d 560 (2018) (quoting RAP 9.12). "An argument that was neither pleaded nor argued to the

superior court on summary judgment cannot be raised for the first time on appeal." Id. (citing Sourakli v. Kyriakos, Inc., 144 Wn. App. 501, 509, 182 P.3d 985 (2008)).

We hold that genuine issues of material fact remain as to causation and reverse the trial court's summary judgment dismissal of the negligence and unseaworthiness claims.[11]

Maintenance and Cure

"Maritime common law requires that a shipowner pay a seaman a daily subsistence allowance (maintenance) and medical treatment (cure) when the seaman becomes ill or injured in the service of a vessel." Tuyen Thanh Mai v. Am. Seafoods Co., LLC, 160 Wn. App. 528, 538, 249 P.3d 1030 (2011) (citing Kasprik v. United States, 87 F.3d 462, 464 (11th Cir.1996)). "'Maintenance' is a per diem living allowance for food and lodging comparable to what the seaman is entitled to while at sea; 'cure' is payment of medical expenses incurred in treating the seaman's injury or illness." Dean, 177 Wn.2d at 406. The seaman's entitlement to maintenance and cure continues until they reach maximum medical recovery (alternatively referred to as maximum cure). Id. Maximum medical recovery is the point at which "'it appears that the seaman's condition is incurable, or that future treatment will merely relieve pain and suffering but not otherwise improve the seaman's physical condition.'" Tuyen Thanh Mai, 160 Wn. App. at 539 (quoting Gaspard v. Taylor Diving & Salvage Co., 649 F.2d 372, 374 n.3 (5th Cir.

---

[11] Because we reverse based on the admitted evidence, we need not consider whether the trial court improperly struck portions of Peak's three declarations filed in opposition to the motion for summary judgment. Accordingly, we also need not consider WSDOT's motion to strike portions of Peak's reply brief challenging the striking of portions of Johnson's declaration. To the extent WSDOT challenges Peak's reliance on the portion of Johnsons' declaration relating to standards for upkeep and maintenance of the vessel, we deny WSDOT's motion to strike that portion because the trial court did not strike that portion of the declaration.

1981)). "If the seaman thereafter needs attention to maintain his improvement at the maximum, to assist him in recovery from relapses, or to restrain the progress of the disease, the shipowner is not bound to provide that." Muruaga v. United States, 172 F.2d 318, 321 (2nd Cir. 1949).

A shipowner's duty to pay maintenance and cure is "'virtually automatic.'" Dean, 177 Wn.2d at 409 (quoting Baucom v. Sisco Stevedoring, LLC, 506 F. Supp. 2d 1064, 1073 (S.D. Ala. 2007)). "A shipowner's duty to pay maintenance and cure is so broad that it arises regardless of the shipowner's fault or negligence or the seaman's contributory fault." Id. at 408 (citing Aguilar v. Standard Oil Co. of N.J., 318 U.S. 724, 735, 63 S. Ct. 930, 87 L. Ed. 1107 (1943)).

> Damages caused by a wrongful denial of maintenance and cure are decided according to "'an escalating scale of liability.'" If a vessel owner is in fact liable for maintenance and cure but reasonably rejected the seaman's claim, the owner incurs liability only for the amount of maintenance and cure owed. But if the vessel owner's refusal was unreasonable, then the owner incurs liability for compensatory damages in addition to maintenance and cure. And if the vessel owner acts not only unreasonably but in a "callous and recalcitrant, arbitrary and capricious, or willful, callous and persistent" manner, the owner incurs additional liability for punitive damages and attorney fees.

Tuyen Thanh Mai, 160 Wn. App. at 540.

We agree with WSDOT that Peak conflates no-fault maintenance and cure under maritime law with his liability claims. Peak has never asserted a claim for wrongful denial of maintenance and cure. He listed "[m]aintenance and cure" as asserted damages as a "direct and proximate result" of his negligence and unseaworthiness claims. In response to WSDOT's summary judgment motion, Peak stated, "[a]s a preliminary matter, Plaintiff is not making claims for general maritime benefits or punitive damages in this matter. To the extent they were pled, those claims are withdrawn."

19

Peak then argued below, as he continues to do on appeal, that his "maintenance and cure claim" should not be dismissed because WSDOT "has not fully compensated Plaintiff for the maintenance and cure for the injuries he sustained while working for [Washington State Ferries] on October 1, 2019."

"Summary disposition of maintenance and cure claims is generally not appropriate. 2 Robert Force & Martin J. Norris, The Law of Seaman § 26:43, at 26-101 (5th ed. 2003). The extent of a seaman's injuries and whether a seaman has reached maximum cure are factual questions, not legal questions." Dean, 177 Wn.2d at 410-11. "Any ambiguities whether maximum cure has been reached are to be resolved in favor of the seaman." Sefcik v. Ocean Pride Alaska, Inc., 844 F. Supp. 1372, 1374 (D. Alaska 1993) (citing Kratzer v. Capital Marine Supply, Inc., 490 F. Supp. 222 (M.D. La. 1980)).

In a response to WSDOT's Request for Admission No. 5, Peak stated he "admits that his doctors have determined that he has reached maximum medical improvement." Peak reiterated in his deposition that "[t]he last time I saw something specifically for my back – the back pain from the accident on the Tillikum was the diagnosis that the doctor made that I had reached maximum medical improvement." He answered in the affirmative when asked if this last medical visit for his back was in 2021. This is consistent with Dr. Seroussi's report completed in 2021. In answer to Interrogatory No. 17 ("Please list with as much specificity as possible all pecuniary losses you contend you have suffered as a result of the Incident referred to in your Complaint including type and amount of each such claimed loss."), Peak stated that he "believes that his past medical bills were paid, and his maintenance was paid up to when he reached

20

maximum medical improvement." Peak admitted in response to WSDOT Request for Admission No. 1 that he "was paid maintenance benefits up until he was at maximum medical improvement." He further admitted "that he believes that all medical bills have been paid by [WSDOT]," and positively affirmed that his complaint "does not state a claim for unpaid general maritime benefits."

Peak argues that dismissal of his maintenance and cure claim is improper because he has not yet been "fully compensated . . . for the maintenance and cure for the injuries he sustained." He submits the declaration of his vocational rehabilitation counselor, Bennett, who stated that Peak "will require future treatment" for his injury.

In Dean, the Washington Supreme Court held that "if a shipowner stops paying maintenance and cure to a seaman because it has determined that the seaman has reached maximum cure, a trial court errs by applying a summary judgment standard to a seaman's motion to reinstate maintenance and cure." 177 Wn.2d at 415. The Dean court further states that in the event of such a motion, the trial court should order the shipowner to reinstate payments under maintenance and cure "unless the shipowner can provide unequivocal evidence that the seaman has reached maximum cure." Id.

In a statement of additional authority, Peak cites to this court's recent decision in Matthew Aird v. Washington State Dep't of Transp., No. 85611-1-I, slip op. at 1 (Wash. Ct. App. May 20, 2024) (unpublished), https://www.courts.wa.gov/opinions/pdf/856111.pdf.[12] In Aird, WSDOT closed Aird's claim and discontinued paying maintenance and cure benefits after his treating

---

[12] "[U]npublished opinions of the Court of Appeals filed on or after March 1, 2013, may be cited as nonbinding authorities, if identified as such by the citing party, and may be accorded such persuasive value as the court deems appropriate." GR 14.1(a). Here, we are responding to Peak's citation of this case as persuasive authority.

physician determined that Aird had reached maximum medical improvement.  Id. at 1.

Aird later petitioned to reinstate his claim after his surgeon testified that he believed,

based on his knowledge and experience, that Aird could benefit from further care and

had not reached maximum medical improvement.  Id. at 3.  We held that there are

material issues of fact as to whether or not Aird reached maximum medical

improvement.  Id. 12.

Unlike the contradictory evidence in Aird, in the instant case Peak admits that his

doctors have determined that he has reached maximum medical improvement and did

not submit any evidence that any doctor disagreed with that determination.  Instead, he

relies on testimony from his vocational rehabilitation counselor, Bennett, who asserted

that Dr. Seroussi "substantially endorsed and agreed with" "future medical treatment."

Bennett's declaration included a letter from the physician who had previously evaluated

Peak and gave Bennett feedback on his recommended life care plan (LCP) for Peak.  In

the letter, the physician commented that Bennett's LCP did not include the physician's

projection of "40-60 visits of noninvasive or minimally invasive treatment over the

patient's estimated lifespan, separate from projected physical therapy needs, involving

chiropractic, massage and/or acupuncture."  The physician also clarified that

> I do not believe that these projected visits would further improve the
> patient's chronic injuries, but they likely would help with intermittent
> flareups, in addition to the physical therapy visits projected within the LCP.

The physician offered to provide further input regarding diagnosis, treatment options,

functional status and prognosis.  But Peak did not submit any testimony from Dr.

Seroussi that Peak had not reached maximum medical improvement.  At most, Peak

submitted, through Bennett, testimony of what Peak needed to maintain his

improvement at the maximum for his LCP.  See Muruaga v. United States, 172 F.2d 318, 321 (2nd Cir. 1949).  Moreover, Peak, in response to the motion for summary judgment, did not disavow or otherwise explain his own admissions that his doctors have determined he has reached maximum medical improvement.

The trial court did not err in dismissing Peak's claim for maintenance and cure.

## CONCLUSION

We reverse the trial court's dismissal of Peak's claims of unseaworthiness and negligence, but affirm its dismissal of Peak's claim for maintenance and cure damages.

_Coburn, J._

WE CONCUR:

_Birk, J._          _Hazelrigg, A.C.J._